ORAL ARGUMENT NOT YET SCHEDULED

**No. 19-1124 (and consolidated cases)**
———————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
———————————————————

**AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS,**

*Petitioner,*

**v.**

**ENVIRONMENTAL PROTECTION AGENCY,**

*Respondent.*

———————————————————

On Petition for Review from the U.S. Environmental Protection Agency
———————————————————

**BRIEF FOR PETITIONERS
URBAN AIR INITIATIVE, ET AL.**
———————————————————

C. BOYDEN GRAY
JONATHAN BERRY
   *Counsel of Record*
JAMES R. CONDE
BOYDEN GRAY & ASSOCIATES
801 17th St NW, #350
Washington, DC 20006
202-955-0620
berry@boydengrayassociates.com

May 12, 2020

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1), and FED. R. APP. P. 26.1, the undersigned counsel certifies as follows:

## *Parties*

### A.    Petitioners

**No. 19-1124**: American Fuel & Petrochemical Manufacturers.

**No. 19-1159**: Petitioner Small Retailers Coalition.

**No. 19-1160**: American Petroleum Institute, American Motorcyclist Association, National Marine Manufacturers Association, Coalition of Fuel Marketers, and Citizens Concerned About E15.

**No. 19-1162**: Urban Air Initiative, Inc., The Farmers' Educational & Cooperative Union of America, d/b/a National Farmers Union, Farmers Union Enterprises, Inc., Big River Resources, LLC, Glacial Lakes Energy, LLC, Clean Fuels Development Coalition, Fagen, Inc., Jackson Express, Inc., Jump Start Stores, Inc., Little Sioux Corn Processors, LLC, South Dakota Farmers Union.

### B.    Respondent

U.S. Environmental Protection Agency (EPA).

## C.    Intervenors in Support of Respondent

American Fuel & Petrochemical Manufacturers,[1] Growth Energy, National Corn Growers Association, Renewable Fuels Association.

### *Rulings Under Review*

Modifications to Fuel Regulations To Provide Flexibility for E15; Modifications to RFS RIN Market Regulations, 84 Fed. Reg. 26,980 (June 10, 2019) (E15 Rule), Joint Appendix (JA) ___.

### *Related Cases*

The consolidated cases were not previously before any court.

This case is related to *Urban Air Initiative v. EPA*, No. 19-1161, et al. By order of this Court, the issue of whether fuel blends containing more than 15% but less than 50% ethanol by volume are regulated "gasoline" under Part 79 and Part 80 of Title 40 of the Code of Federal Regulations, was severed from this case, No. 19-1124, et al., assigned a new docket number, No. 20-1004, consolidated with *Urban Air Initiative, et al., v. EPA*, No. 19-1161, and held in abeyance. Order (Jan. 8, 2020), Dkt. #1823237.

There are no other related cases.

May 12, 2020

/s/ Jonathan Berry
Jonathan Berry

---

[1] American Fuel & Petrochemical Manufacturers intervenes in support of EPA only in *Urban Air Initiative v. EPA*, No. 19-1162.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Petitioners make the following disclosures:

Urban Air Initiative, Inc. (UAI) is a social welfare organization incorporated in a manner consistent with Section 501(c)(4) of the Internal Revenue Code. UAI is dedicated to educating the public about the health threats posed by domestic use of petroleum-based fuels, and to taking positive steps to reduce the threat to public health by encouraging a change in the additives used in such fuels. UAI has no parent companies, and no publicly held company has a 10% or greater ownership interest in UAI.

The Farmers' Educational & Cooperative Union of America, d/b/a National Farmers Union, is a Texas nonprofit agricultural organization incorporated in a manner consistent with Section 501(c)(5) of the Internal Revenue Code. Established in 1902, National Farmers Union works to protect and enhance the economic wellbeing and quality of life for family farmers, fishers, ranchers, and rural communities, including farmers who grow corn for use in fuel ethanol. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in Nation Farmers Union.

Farmers Union Enterprises, Inc., is a Minnesota corporation that oversees a diverse portfolio of farm-related businesses, including fuel ethanol

plants. It also promotes and advocates for rural economic development and the interests of family farmers and ranchers across the upper Midwest. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in Farmers Union Enterprises.

Big River Resources, LLC is an Iowa holding company with various subsidiaries currently engaged in the production of fuel ethanol. Its subsidiaries own ethanol plants that produce approximately 200 million gallons of fuel ethanol per year. It has no parent companies. Farmers Energy Big River, LLC has a 10% or greater ownership interest in Big River Resources.

Glacial Lakes Energy, LLC is wholly owned by the Glacial Lakes Corn Processors. Glacial Lakes Corn Processors is a South Dakota cooperative with 4,100 shareholder/investors who reside primarily in eastern South Dakota. Glacial Lakes Energy, LLC is the sole owner of two large ethanol production facilities that annually produce over 240 million gallons of fuel ethanol. No publicly held company has a 10% or greater ownership interest in Glacial Lakes Energy, LLC.

Clean Fuels Development Coalition (CFDC) is a business league organization established in a manner consistent with Section 501(c)(6) of the Internal Revenue Code. Established in 1988, CFDC works with auto, agriculture, and biofuel interests in support of a broad range of energy and

environmental programs. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in CFDC.

Fagen, Inc., is a Minnesota industrial construction company whose projects include biorefineries engaged in the production of fuel ethanol. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in Fagen, Inc.

Jackson Express, Inc., is a fuel retailer and convenience store organized under the laws of Nebraska. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in Jackson Express, Inc.

Jump Start Stores, Inc., is a fuel retailer and convenience store organized under the laws of Kansas. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in Jump Start Stores, Inc.

Little Sioux Corn Processors, LLC is an Iowa renewable fuel producer currently engaged in the production of fuel ethanol. Little Sioux Corn Processors, LLC has no parent companies. Little Sioux Corn Processors, LLC owns the sole general partnership interest of LSCP, LLLP d/b/a Little Sioux Corn Processors, LLLP. Archer Daniels Midland Company is a publicly held company that has a 10% or greater ownership interest in LSCP, LLLP d/b/a Little Sioux Corn Processors, LLLP.

South Dakota Farmers Union is a nonprofit organization that works to promote the interests of South Dakota farmers, ranchers, and their families, including those who grow corn for use in fuel ethanol. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in South Dakota Farmers Union.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .... i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ......................... iii

TABLE OF CONTENTS ................................................................... vii

TABLE OF AUTHORITIES ............................................................... x

GLOSSARY .................................................................................. xviii

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUES ........................................................................................... 1

STATUTES AND REGULATIONS ...................................................... 2

INTRODUCTION ............................................................................. 2

STATEMENT OF THE CASE ............................................................. 4

    I.    The Clean Air Act's Framework for Fuel and Fuel Additive Regulation ............................................................................. 4

        A.   Fuel and Fuel Additive Registration and Controls .............. 4

        B.   The Sub-Sim Law ............................................................. 5

        C.   The Definition of "Fuel Manufacturer" .............................. 8

        D.   The Volatility Waiver for Fuel Blends Containing Gasoline and 10 Percent Ethanol ....................................... 9

    II.   EPA's Past Definition of "Substantially Similar" for Gasoline Test Fuels ....................................................................... 10

        A.   E0 Gasoline Test Fuels .................................................... 10

        B.   E10 Gasoline Test Fuels .................................................. 11

        C.   High-Level Ethanol-Gasoline Test Fuel ............................ 13

III. EPA's Guidance on Mid-Level Blends Sold for use in Flex-Fuel Vehicles ............................................................................... 14

IV. The E15 Waiver ......................................................................... 17

V. The E15 Rule ............................................................................. 18

    A. The E15 Rule's Solution to Allow the Year-Round Sale of E15 ............................................................................... 18

    B. The E15 Rule's Response to Comments Relating to Fuel Blends Other than E15 .................................................... 20

    C. The E15 Rule's Treatment of Mid-Level Ethanol Blends .. 21

SUMMARY OF ARGUMENT .................................................... 24

STANDING ................................................................................ 27

STANDARD OF REVIEW ......................................................... 28

ARGUMENT .............................................................................. 30

I. The Sub-Sim Law Does not Prohibit Mid-Level Blends, Because Ethanol Is a Fuel Additive Utilized in Certification. ..... 30

    A. Ethanol is a "fuel additive" utilized in certification. .......... 31

    B. The sub-sim law does not limit the concentration of substantially similar fuel additives. .................................. 40

II. The Sub-Sim Law Does not Prohibit Mid-Level Blends, Because they Are "Substantially Similar" to the High-Level Ethanol-Gasoline Test Fuel. ....................................................... 45

    A. Mid-level blends are "substantially similar" to the high-level gasoline-ethanol test fuel. ......................................... 45

    B. A contrary interpretation would overturn serious industry reliance interests. ................................................ 47

C.    Because mid-level blends are not prohibited by the sub-sim law, the E15 Rule's restrictions on mid-level blends are unlawful. ................................................................. 49

III.    EPA Failed to Consider Comments and Evidence Demonstrating that Fuel Blends Containing Gasoline and 20% Ethanol or 16% Isobutanol Are "Substantially Similar" to E10 Certification Fuel. ...................................................................... 50

A.    The comments were significant. ........................................ 51

B.    The presidential directive does not excuse EPA's failure to respond to comments. ................................................. 53

IV.    The Court Should Remand the Rule Without Vacatur. .............. 55

CONCLUSION ........................................................................................... 56

CERTIFICATE OF COMPLIANCE

ADDENDA

ADDENDUM A: STANDING DECLARATIONS ......................... A-1

ADDENDUM B: STATUTES AND REGULATIONS .................... B-1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

\* *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
429 F.3d 1136 (D.C. Cir. 2005) ................................................................55, 56

*American Farm Bureau Fed'n v. EPA,*
559 F.3d 512 (D.C. Cir. 2009) ................................................................. 56

*American Methyl Corp. v. EPA,*
749 F.2d 826 (1984) ................................................................. 43

*Amoco Oil Co. v. EPA,*
501 F.2d 722 (D.C. Cir. 1974) .........................................................5

*Bragdon v. Abbott,*
524 U.S. 624 (1998) ................................................................. 36

*Chevron, U.S.A., Inc. v. NRDC,*
467 U.S. 837 (1984) ................................................................. 28

*City of Portland v. EPA,*
507 F.3d 706 (D.C. Cir. 2007) ................................................................. 52

*Encino Motorcars, LLC v. Navarro,*
136 S. Ct. 2117 (2016) ................................................................29, 40, 48

*Ethyl Corp. v. EPA,*
541 F.2d 1 (D.C. Cir. 1976) ................................................................. 5

*Ethyl Corp. v. EPA,*
51 F.3d 1053 (D.C. Cir. 1995) .........................................................34, 43

*FCC v. Fox Television Stations,*
556 U.S. 502 (2009) ................................................................29, 40, 48

*Food Mkt'g Inst. v. Argus Leader Media,*
139 S. Ct. 2364 (2019) ................................................................. 32

*Gen. Chem. Corp. v. United States*,
    817 F.2d 844 (D.C. Cir. 1987) ............................................29, 39

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ...........................................................33, 34

*Home Box Office, Inc. v. FCC*,
    567 F.2d 9 (D.C. Cir. 1977) ................................................. 52

*Int'l Fabricare Inst. v. EPA*,
    972 F.2d 384 (D.C. Cir. 1992) ............................................. 54

*Judulang v. Holder*,
    565 U.S. 42 (2011) ...........................................................49, 54

*Loughrin v. United States*,
    573 U.S. 351 (2014) ...............................................................42

\* *Lubrizol Corp. v. EPA*,
    562 F.2d 807 (D.C. Cir. 1977) ...............................................37

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................. 27

*Mohasco Corp. v. Silver*,
    447 U.S. 807 (1980) ............................................................. 33

*Moskal v. United States*,
    498 U.S. 103 (1990) ............................................................. 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...........................................................29, 54

*Nat'l Lifeline Ass'n v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ...........................................48, 50

*Neustar, Inc. v. FCC*,
    857 F.3d 886 (D.C. Cir. 2017) .............................................28, 29

*Rodriguez v. United States*,
    480 U.S. 522 (1987) ............................................................. 37

*Rusello v. United States*,
464 U.S. 16 (1983) ..................................................... 42

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012) .................................. 54

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ................................................. 40

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) .................................. 53

*SoundExchange, Inc. v. Copyright Royalty Bd.*,
904 F.3d 41 (D.C. Cir. 2018) .................................... 28

*State Nat. Bank of Big Spring v. Lew*,
795 F.3d 48 (D.C. Cir. 2015) .................................... 27

*Stokeling* v. *United States*,
139 S. Ct. 544 (2019) ............................................... 35

*United States Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016) .................................. 56

## PUBLIC LAWS AND U.S. CODE

CAA § 113(c)(2)(A), 42 U.S.C. § 7413(c)(2)(A) ............................................. 45

CAA § 203(a)(3)(A), 42 U.S.C. § 7522(a)(3)(A) .............................................45

CAA § 206(a)(4)(A), 42 U.S.C. § 7525(a) ...................................................... 10

CAA § 211(a), 42 U.S.C. § 7545(a) ............................................. 4, 8, 23, 33, 34

CAA § 211(b), 42 U.S.C. § 7545(b) ................................................. 4, 8, 33, 34

CAA § 211(b)(2)(B), 42 U.S.C. § 7545(b)(2)(B) ............................................... 6

CAA § 211(b)(4)(A)(i)(VI), 42 U.S.C. § 7545(b)(4)(A)(i)(VI) ......................... 33

CAA § 211(c)(1), 42 U.S.C. § 7545(c)(1) ..................................... 4, 5, 6, 34, 44

CAA § 211(d)(1), 42 U.S.C. § 7545(d)(1)................................................27, 48

CAA § 211(e), 42 U.S.C. § 7545(e) ............................................... 7, 33, 44

CAA § 211(f), 42 U.S.C. § 7545(f).................................... 7, 31, 34, 35, 40, 43

CAA § 211(f)(1), 42 U.S.C. § 7545(f)(1) ................. 1, 13, 19, 20, 21, 42, 49, 56

CAA § 211(f)(1)(A), 42 U.S.C. § 7545(f)(1)(A) ................................................ 7

CAA § 211(f)(1)(B), 42 U.S.C. § 7545(f)(1)(B) ...................................... 7, 30, 45

CAA § 211(f)(4), 42 U.S.C. § 7545(f)(4) .............................. 7, 8, 17, 38, 42, 47

CAA § 211(h)(1), 42 U.S.C. § 7545(h)(1) .......................................... 9

CAA § 211(h)(4), 42 U.S.C. § 7545(h)(4) .............................. 10, 17, 18, 19, 22

CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1).......................................... 1

CAA § 307(d)(6)(B), 42 U.S.C. § 7607(d)(6)(B) .........................................1, 51

CAA § 307(d)(9), 42 U.S.C. § 7607(d)(9).......................................... 56

CAA § 307(d)(9)(A), 42 U.S.C. § 7607(d)(9)(A) .......................................... 28

## LEGISLATIVE HISTORY

S. Comm. on Env't & Public Works, 95th Cong., A Legislative History
  of the Clean Air Act Amendments of 1977 ............................................... 6, 7

S. Rep. No. 95-127 (1977)................................................................ 6

S. Rep. No. 101-228 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385 ................. 10

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 19.4, Table 2 ................................................................27, 42

40 C.F.R. § 79.2(d) ................................................................ 8

40 C.F.R. § 79.2(d)(2) ............................................................... 8

40 C.F.R. § 79.2(e) ................................................................... 34

40 C.F.R. § 79.11(i) .................................................................. 24

40 C.F.R. § 79.11(j) .................................................................. 44

40 C.F.R. § 79.21(i) .................................................................. 44

40 C.F.R. § 79.21(h) ................................................................. 35

40 C.F.R. § 79.31(a) ........................................................... 4, 5, 35

40 C.F.R. § 79.32(a)(1) ....................................................... 4, 5, 34

40 C.F.R. § 79.51(c)(3) .............................................................. 44

40 C.F.R. § 79.56(e)(3)(i)(B) ..................................................... 44

40 C.F.R. § 79.56(e)(4)(ii)(A)(iii) .............................................. 44

40 C.F.R. § 80.27(d)(2) ........................................................ 19, 22

40 C.F.R. § 80.1504(a)(1) .......................................................... 44

40 C.F.R. § 80.1504(a)(3) .......................................................... 16

40 C.F.R. § 86.113-04(a)(3)(i) ................................................... 12

40 C.F.R. § 86.113-15(a)(1) ....................................................... 12

40 C.F.R. § 86.1824-08(f)(1) ...................................................... 12

40 C.F.R. § 86.1803-01 .............................................................. 14

40 C.F.R. § 1065.710(b) ........................................................ 12, 13

40 C.F.R. § 1065.725 ............................................................ 13, 45

F<span>EDERAL</span> R<span>EGISTER</span>

38 Fed. Reg. 1254 (Jan. 10, 1973) .................................................. 5

*Control of Air Pollution From Motor Vehicles: Tier 3 Motor Vehicle and Fuel Standards,* 79 Fed. Reg. 23,414 (Apr. 28, 2014) ........................ 12, 13, 14, 46

*Fuels and Fuel Additives; Definition of Substantially Similar,*
45 Fed. Reg. 67,443 (Oct. 10, 1980) ....................................... 11, 39, 42, 43

*Fuels and Fuel Additives: Gasohol; Marketability,*
44 Fed. Reg. 20,777 (Apr. 6, 1979)............................................ 11

*Fuels and Fuel Additives; Grant of Waiver Application,*
60 Fed. Reg. 36,414 (July 17, 1995) ......................................... 43

*Fuels and Fuel Additives Registration Regulations,*
59 Fed. Reg. 33,042 (June 27, 1994).......................................... 7

*Fuels and Fuel Additives; Revised Definition of "Substantially Similar,"*
46 Fed. Reg. 38,582 (July 28, 1981) ....................................... 11, 39

*Partial Grant of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent,*
76 Fed. Reg. 4662 (Jan. 26, 2011) .................................................. 17

*Registration of Fuels and Fuel Additives,*
40 Fed. Reg. 52,009 (Nov. 7, 1975).................................... 4, 6, 8, 36

*Registration of Fuels and Fuel Additives: Changes in Requirements, and Applicability to Blenders of Deposit Control Gasoline Additives,*
62 Fed. Reg. 12,564 (Mar. 17, 1997) .......................................... 9

*Regulations of Fuels and Fuel Additives; Definition of Substantially Similar,*
56 Fed. Reg. 5352 (Feb. 11, 1991) .......................................... 11

*Regulation of Fuels and Fuel Additives: Revised Definition of Substantially Similar Rule for Alaska,*
73 Fed. Reg. 22,277 (Apr. 25, 2008)........................................ 11

*Regulation To Mitigate the Misfueling of Vehicles and Engines With Gasoline Containing Greater Than Ten Volume Percent Ethanol and Modifications to the Reformulated and Conventional Gasoline Programs,* 76 Fed. Reg. 44,406 (July 25, 2011)*, as amended in* 79 Fed. Reg. 42,128 (July 18, 2014) ................................................. 16, 17, 44

## MISCELLANEOUS

2019 Minnesota E85 + Mid-blends Station Report........................................ 16

Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts (2012) ...............................................................................34, 36

API, Determination of the Potential Property Ranges of Mid-Level Ethanol Blends (2010)................................................................................. 18

Dep't of Energy, Handbook for Handling, Storing, and Dispensing E85 and Other Ethanol-Gasoline Blends (2016) .........................................14, 47

Dep't of Transp. et al., Effects of the Alternative Motor Fuels Act CAFE Incentives Policy (2002) .....................................................................13, 14

EPA, Fuel Trends Report: Gasoline 2006-2016............................................. 18

EPA Report to Congress on Public Health, Air Quality, and Water Resource Impacts of Fuel Additive Substitutes for MTBE (2009) ............. 33

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527 (1947) ................................................................... 35

Letter from Adam Kushner, Dir., Air Enforcement Div., EPA (July 31, 2008) .............................................................................. 15, 44, 45

Letter from Byron Bunker, Acting Dir., Compliance Div., Office of Transp. & Air Quality, EPA (Feb. 17, 2012) ........................................... 17

Letter from Margo Oge, Dir., Office of Transp. & Air Quality, EPA (Nov. 28, 2006) .................................................................... 14, 15, 45, 47

Standard Practice for Blending Mid-Level Ethanol Fuel Blends for
 Flexible-Fuel Vehicles with Automotive Spark-Ignition Engines,
 ASTM D7794-18a ................................................................... 16

Theodore L. Brown et al., Chemistry 10 (12th ed. 2012) ............................... 41

USDA Announces $210 Million To Be Invested in Renewable Energy
 Infrastructure Through the Biofuel Infrastructure Partnership (Oct.
 28, 2015)................................................................................. 16

Webster's (Third) Int'l Dictionary 24 (1966) ...........................................33, 41

White House Fact Sheet (Oct. 11, 2018) ...................................................... 54

# GLOSSARY

1977 Legislative History ............S. Comm. on Env't & Public Works, 95th Cong., A Legislative History of the Clean Air Act Amendments of 1977

2006 Oge Letter .........................Letter from Margo Oge, Dir., Office of Transp. & Air Quality, EPA (Nov. 28, 2006)

2008 Kushner Letter ..................Letter from Adam Kushner, Dir., Air Enforcement Div., EPA (July 31, 2008)

Alcohol ....................................Organic compounds that include at least one hydroxyl group (-OH) attached to a hydrocarbon chain (CH-) (e.g., ethanol is $CH_3$-$CH_2$-OH)

Aliphatic .................................Organic compounds arranged in open (non-ringed) chains.

ASTM D7794............................Standard Practice for Blending Mid-Level Ethanol Fuel Blends for Flexible-Fuel Vehicles with Automotive Spark-Ignition Engines, ASTM D7794-18a

CAA  .......................................The Clean Air Act

Certification fuel.......................A test fuel approved by EPA under § 206(a)(4)(A) of the Clean Air Act

Denatured fuel ethanol ..............Ethyl alcohol denatured to make it unfit for human consumption and which complies with the requirements of 40 C.F.R. § 80.1610.

DOE Ethanol Handbook  ..........Dep't of Energy, Handbook for Handling, Storing, and Dispensing E85 and Other Ethanol-Gasoline Blends (2016)

E0      .......................................Fuel blends consisting of gasoline and no ethanol

E10 ........................................Fuel blends consisting of gasoline and 9 to 10 percent ethanol

E15 ........................................Fuel blends consisting of gasoline and 10 to 15 percent ethanol

E15 Waiver ..............................*Partial Grant of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent*, 76 Fed. Reg. 4662 (Jan. 26, 2011)

E15 Rule ..................................*Modifications to Fuel Regulations To Provide Flexibility for E15; Modifications to RFS RIN Market Regulations*, 84 Fed. Reg. 26,980 (June 10, 2019)

E20 ........................................Fuel blends consisting of gasoline and 20 percent ethanol

E30 ........................................Fuel blends consisting of gasoline and 30 percent ethanol

E85 ........................................Fuel blends consisting of gasoline and 51 to 83 percent ethanol.

Ethanol ...................................Ethyl alcohol, a compound with the molecular formula $CH_3\text{-}CH_2\text{-}OH$

FFV ........................................Flex-fuel vehicle, a vehicle certified to operate on any fuel mixture consisting of gasoline and up to 83 percent ethanol

Isobutanol ...............................An alcohol compound with the molecular formula $(CH_3)_2\text{-}CH\text{-}CH_2\text{-}OH$

Mid-level blends .......................Fuel blends consisting of gasoline and more than 15 but less than 50 percent ethanol

Misfueling Rule .......................... *Regulation To Mitigate the Misfueling of Vehicles and Engines With Gasoline Containing Greater Than Ten Volume Percent Ethanol and Modifications to the Reformulated and Conventional Gasoline Programs*, 76 Fed. Reg. 44,406 (July 25, 2011), *as amended in* 79 Fed. Reg. 42,128 (July 18, 2014)

MMT ....................................... The fuel additive methylcyclopentadienyl manganese tricarbonyl

MTBE ...................................... The fuel additive methyl tertiary butyl ether

Oxygenate ................................. An oxygen-containing organic compound, such as an alcohol or ether, used as a gasoline fuel additive

Psi         ....................................... Pounds per square inch, an English unit of pressure, equal to the gravitational weight exerted by one pound over a square inch.

Response to Comments ............. Modifications to Fuel Regulations To Provide Flexibility for E15; Modifications to RFS RIN Market Regulations: Response to Comments, EPA-420-R-19-004 (May 2019)

RVP    ...................................... Reid Vapor Pressure, a standard measure of fuel volatility at 100 degrees Fahrenheit

Sub-sim law .............................. § 211(f) of the Clean Air Act

Tier 3 Rule  .............................. *Control of Air Pollution From Motor Vehicles: Tier 3 Motor Vehicle and Fuel Standards*, 79 Fed. Reg. 23,414 (Apr. 28, 2014)

## JURISDICTIONAL STATEMENT

The basis for this Court's jurisdiction is § 307(b)(1) of the Clean Air Act (CAA).[2] The rule under review was published in the Federal Register on June 10, 2019. 84 Fed. Reg. 26,980, JA___. The consolidated petitions were timely filed on or before August 9, 2019.

## ISSUES

1.      Whether EPA's interpretation of the "sub-sim" law, CAA § 211(f)(1), to prohibit fuel and fuel additive manufacturers from selling fuel blends consisting of gasoline and more than 15% but less than 50% ethanol ("mid-level blends"), is contrary to statutory authority, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

2.      Whether EPA's failure to consider comments demonstrating that fuel blends consisting of gasoline and 20% ethanol or 16% isobutanol are "substantially similar" to a gasoline certification test fuel under CAA § 211(f)(1), violated EPA's duty to respond "to each of the significant comments, criticisms, and new data submitted," CAA § 307(d)(6)(B), or is

_____

[2] All citations are to the CAA; the Table of Authorities provides parallel citations to the U.S. Code.

1

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in Addendum B.

## INTRODUCTION

Petitioners challenge the E15 Rule's interpretation of the CAA's "sub-sim" law, CAA § 211(f), to forbid the sale of mid-level fuel blends. The sub-sim law makes it "unlawful" to introduce motor vehicle fuels or fuel additives into commerce unless they are "substantially similar" to a test fuel or test fuel additive used by automakers to certify compliance with the CAA's motor vehicle standards. *Id.* Mid-level blends are not prohibited by the sub-sim law because they are indisputably "substantially similar" to test fuels or test fuel additives. But EPA has misinterpreted the sub-sim law to forbid fuel blends its text authorizes.

When the sub-sim law was enacted, none of the test fuels used by automakers contained ethanol, and EPA properly interpreted the sub-sim law to limit the concentration of ethanol in gasoline. That interpretation of the sub-sim law is now obsolete. Automakers today use gasoline test fuels with 10% (E10) and 15% (E15) ethanol to certify most gasoline-fueled motor vehicles,

and test fuels with up to 83% ethanol to certify "flex-fuel vehicles" designed to operate on any mixture of gasoline and ethanol. Because ethanol is now used as a test fuel additive, the sub-sim law no longer limits the addition of ethanol to gasoline. And because mid-level blends are indisputably "substantially similar" to at least the test fuel containing up to 83% ethanol, the sub-sim law cannot prohibit the sale of such blends. Yet the E15 Rule rejects the natural interpretation of the sub-sim law and interprets "substantially similar" to cap the concentration of ethanol in gasoline to 15% ethanol (E15), based solely on a comparison to the E10 test fuel. This interpretation of the sub-sim law is illegal, anti-competitive, and unnecessary to protect motor vehicle emission controls. The Court should reject the E15 Rule's erroneous interpretation of the sub-sim law and affirm that the law does not prohibit the sale of mid-level blends.

In the alternative, Petitioners also challenge the E15 Rule's failure to respond to comments and data demonstrating that fuel blends consisting of gasoline and 20% ethanol (E20) or 16% isobutanol (I16) are "substantially similar" to the E10 test fuel. The proposed rule invited comment on whether such fuel blends are "substantially similar" to the gasoline-ethanol emissions test fuel. Commenters responded by submitting data demonstrating that E20 and I16 are "substantially similar." But the final rule failed to substantively

respond to these comments and incongruously asserted that the comments EPA itself had invited were outside of the scope of the rulemaking. That is a textbook violation of the Agency's duty to respond to relevant comments. The Court should remand the rule so EPA can meaningfully consider such comments and provide a non-arbitrary justification for its decision to cap the concentration of ethanol at E15.

## STATEMENT OF THE CASE

### I.    THE CLEAN AIR ACT'S FRAMEWORK FOR FUEL AND FUEL ADDITIVE REGULATION

#### A.    Fuel and Fuel Additive Registration and Controls

"The Air Quality Act of 1967 and the CAA of 1970 established the basic framework for EPA's fuels regulations." 84 Fed. Reg. at 26,984, JA___. Under that basic framework, EPA has authority to require the registration of fuels and fuel additives, to require testing of such fuels and fuel additives, and to control or prohibit fuels or fuel additives that harm public health and welfare or impair motor vehicle emission controls. *See* CAA § 211(a) (registration), (b) (testing), (c)(1) (controls or prohibitions).

EPA has exercised its authority under § 211(a) to "designate" (require the registration of) "motor vehicle gasoline" and its additives. *See Registration of Fuels and Fuel Additives*, 40 Fed. Reg. 52,009, 52,014 (Nov. 7, 1975); 40 C.F.R.

§§ 79.31(a), 79.32(a)(1). It has also controlled gasoline and its additives to avoid harm to public health or emissions control devices under § 211(c)(1). *See generally* 40 C.F.R. Part 80, Subparts A, B, H, L, N, O (gasoline regulations).

## B.    The Sub-Sim Law

In 1973, EPA concluded that the gasoline additive tetraethyl lead would impair the catalytic converters that automakers were developing to meet 1975 emission standards. 38 Fed. Reg. 1254, 1254 (Jan. 10, 1973). EPA acted under § 211(c)(1) to require the sale of unleaded gasoline and to prohibit fueling new catalyst-equipped vehicles with leaded gasoline. *See Amoco Oil Co. v. EPA*, 501 F.2d 722, 726 (D.C. Cir. 1974).

The removal of lead from gasoline posed a significant challenge for refiners and automakers. Lead had been used as an "antiknock" additive to increase gasoline's octane, a property which "allows for higher compression engines, which operate with greater efficiency." *Ethyl Corp. v. EPA*, 541 F.2d 1, 7 (D.C. Cir. 1976) (*Ethyl I*). To replace lead, refiners turned to other antiknock additives that posed unknown risks to catalytic converters.

One of these antiknock additives was the organo-metallic compound methylcyclopentadienyl manganese tricarbonyl, or MMT. But automakers were concerned that the growing use of MMT or other novel additives in unleaded gasoline would, much like lead, impair catalytic converters and

thereby increase vehicle emissions. *See* S. Rep. No. 95-127, at 90 (1977), *reprinted in* S. Comm. on Env't & Public Works, 95th Cong., 3 A Legislative History of the Clean Air Act Amendments of 1977 1464 (1977 Legislative History) (testimony "indicated that . . . MMT . . . was impairing the performance of emission control systems and increasing hydrocarbon emissions in test vehicles"), JA___; *id.* at 758–59, 764 (Senator Muskie) (same), JA___.

Existing CAA statutes and regulations were inadequate to deal with the risk posed by MMT and similar fuel additives, for two reasons. First, fuels and fuel additives could be registered under EPA's rules without any prior testing of their effects "on the emission control performance of any vehicle." CAA § 211(b)(2)(B); *see also* 40 Fed. Reg. at 52,012 (EPA "*may* require" such tests) (emphasis added). Second, and relatedly, because EPA lacked test data about the effects of MMT and similar additives on emission controls, the Agency would be unable to control these additives under § 211(c)(1) in time to avoid possible irreparable harm to vehicle catalysts.

To prevent this risk, Congress responded in 1977 by amending CAA § 211 in two ways.

First, Congress required EPA to promulgate emission and health effects testing requirements as a prerequisite to the registration of designated fuels and

fuel additives. CAA § 211(e); *see also Fuels and Fuel Additives Registration Regulations*, 59 Fed. Reg. 33,042 (June 27, 1994) (implementing § 211(e)).

Second, Congress enacted the "sub-sim" law. CAA § 211(f). Paragraph (1)(A) of that law provides as follows:

> Effective upon March 31, 1977, it shall be unlawful for any manufacturer of any fuel or fuel additive to first introduce into commerce, or to increase the concentration in use of, any fuel or fuel additive for general use in light duty motor vehicles manufactured after model year 1974 which is not substantially similar to any fuel or fuel additive utilized in the certification of any model year 1975, or subsequent model year, vehicle or engine under section 206.

CAA § 211(f)(1)(A).[3]

The sub-sim law protects model-year 1975 and later light-duty vehicles because that is when new "catalyst-equipped vehicles"—designed for unleaded gasoline—had to be sold in widespread numbers in order to meet the stringent model year 1975 emission performance standards. 1977 Legislative History 1464, JA___.

Manufacturers who want to sell fuels or fuel additives barred under the sub-sim law must apply for a waiver under CAA § 211(f)(4), which EPA may grant only if an "applicant has established that such fuel or fuel additive or a

_____

[3] In 1990, the sub-sim law's prohibition was expanded to fuels and fuel additives sold for "use by any person in motor vehicles," not just for general use in light-duty vehicles. CAA § 211(f)(1)(B).

specified concentration thereof, . . . will not cause or contribute to a failure of any emission control device or system . . . to achieve compliance by the vehicle or engine with the emission standards with respect to which it has been certified." CAA § 211(f)(4).

### C.    The Definition of "Fuel Manufacturer"

The CAA's § 211 registration requirements and the sub-sim law apply only to fuel or fuel additive "manufacturer[s]." CAA § 211(a), (b), (f).[4] In general, EPA defines "fuel manufacturer" to mean "any person who, for sale or introduction into commerce, produces, manufactures, or imports a fuel or causes or directs the alteration of the chemical composition of a bulk fuel, or the mixture of chemical compounds in a bulk fuel, by adding to it an additive." 40 C.F.R. § 79.2(d).

Because ethanol is blended downstream of refineries by many terminal operators, this broad definition of "fuel manufacturer" would require terminal operators to register gasoline, even though they are simply combining registered fuels and fuel additives. But recognizing the "unique market structure for ethanol blending activities," EPA excluded from its definition of

_____

[4] CAA § 211(a) uses the term "manufacturer or processor," but in 1975 EPA concluded that "the terms 'manufacturer' and 'processor' were [not] meant to denote separate classes of producers." 40 Fed. Reg. at 52,010.

fuel manufacturer "*all* entities whose only 'manufacturing' activity is the blending of oxygenate," such as ethanol. *Registration of Fuels and Fuel Additives: Changes in Requirements, and Applicability to Blenders of Deposit Control Gasoline Additives*, 62 Fed. Reg. 12,564, 12,566 (Mar. 17, 1997) (emphasis added). Under EPA's rules, "[a] party (other than a fuel refiner or importer) who adds an oxygenate compound [e.g., ethanol] to fuel in any otherwise allowable amount is not thereby considered a fuel manufacturer." 40 C.F.R. § 79.2(d)(2). Thus, ethanol blenders like terminal operators who only add a lawful concentration of ethanol to gasoline are not "fuel manufacturers" subject to the fuel registration requirements.

### D. The Volatility Waiver for Fuel Blends Containing Gasoline and 10 Percent Ethanol

When gasoline evaporates, it contributes to air pollution. Gasoline with a higher volatility or "Reid Vapor Pressure" (RVP) tends to evaporate more, especially at higher temperatures.

To control gasoline's tendency to evaporate, in 1990 Congress prohibited "gasoline with a Reid Vapor Pressure in excess of 9.0 pounds per square inch (psi)" during the "high ozone season." CAA § 211(h)(1). But recognizing that volatility controls would impose a special burden on gasoline blended with ethanol, Congress simultaneously allowed a 1-psi RVP waiver (i.e. an RVP

standard of 10.0 psi) "[f]or fuel blends containing gasoline and 10 percent denatured anhydrous ethanol." CAA § 211(h)(4). Congress granted this waiver to achieve the "beneficial environmental, economic, agricultural, energy security and foreign policy implications" of ethanol blending. S. Rep. No. 101-228, at 110 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3495, JA___. Congress noted that while the waiver could increase vehicle evaporative emissions, "ethanol blends burn cleaner than pure hydrocarbon gasoline and thus cause fewer tailpipe emissions." *Id.*

## II. EPA'S PAST DEFINITION OF "SUBSTANTIALLY SIMILAR" FOR GASOLINE TEST FUELS

### A. E0 Gasoline Test Fuels

Automakers must test new vehicles for compliance with CAA standards using test fuels (or "certification fuels") that meet EPA's specifications. *See* CAA § 206(a)(4)(A) (authorizing EPA to set and revise "test procedures" and test fuel "characteristics").

Until recently, automakers used two "neat" gasoline (E0) test fuels to certify light-duty vehicles: an emissions test fuel and a mileage-accumulation fuel. 84 Fed. Reg. at 26,994, JA___. Historically, "the fuel used in emissions testing . . . contained no oxygenates (*e.g.*, ethanol) and was often referred to by its brand name, 'indolene.' " *Id.* The mileage-accumulation fuel, used to age

vehicles to test the durability of emission controls, also contained no ethanol.

*Id.*

In a series of rules issued in 1980, 1981, and 1991, EPA sought to define the range of fuels and fuel additives that are "substantially similar" to these test fuels and their additives and could therefore be sold in the marketplace.[5] EPA's 1991 definition required that gasoline "contain no more than 2.7 percent oxygen by weight"—roughly 7.7% ethanol by volume. 1991 Sub-Sim Rule, 56 Fed. Reg. at 5356. This restriction had little practical impact on ethanol, because fuel manufacturers could sell fuel blends consisting of gasoline and 10% ethanol (E10) under a 1979 sub-sim waiver issued under § 211(f)(4). *Fuels and Fuel Additives: Gasohol; Marketability*, 44 Fed. Reg. 20,777 (Apr. 6, 1979).

## B.    E10 Gasoline Test Fuels

In the early 2000s, sales of E10 increased as manufacturers used ethanol to replace the octane additive methyl tertiary butyl ether (MTBE), which was

---

[5] *See Fuels and Fuel Additives; Definition of Substantially Similar*, 45 Fed. Reg. 67,443, 67,443 (Oct. 10, 1980) (1980 Sub-Sim Rule); *Fuels and Fuel Additives; Revised Definition of "Substantially Similar,"* 46 Fed. Reg. 38,582 (July 28, 1981) (1981 Sub-Sim Rule); *Regulations of Fuels and Fuel Additives; Definition of Substantially Similar*, 56 Fed. Reg. 5352 (Feb. 11, 1991) (1991 Sub-Sim Rule). In 2008, EPA republished the 1991 rule with minor adjustments for Alaska. *See Regulation of Fuels and Fuel Additives: Revised Definition of Substantially Similar Rule for Alaska*, 73 Fed. Reg. 22,277 (Apr. 25, 2008).

found to pollute groundwater. *See* 84 Fed. Reg. at 26,986, JA___. Over time,

EPA responded to the change in market fuel with corresponding changes to

the gasoline certification fuels. *See id.* at 26,994, JA___.

In 2004, EPA changed the mileage-accumulation fuel used to test the

durability of vehicle evaporative emission controls. EPA required automakers

to "employ gasoline fuel . . . which contains ethanol in, at least, the highest

concentration permissible in gasoline under federal law and that is

commercially available in any state," which was E10 at the time. 40 C.F.R.

§ 86.1824-08(f)(1).[6]

As E10 became "generally available through retail outlets," automakers

also began using E10 to test the durability of tailpipe emission controls. *Id.*

§ 86.113-04(a)(3)(i).

Finally, in 2014, EPA "changed the [emissions] certification test fuel

from E0 to E10 to reflect the widespread use of E10 in the marketplace." 84

Fed. Reg. at 26,994, JA___; 40 C.F.R. §§ 86.113-15(a)(1), 1065.710(b); *see also*

*Control of Air Pollution From Motor Vehicles: Tier 3 Motor Vehicle and Fuel*

*Standards*, 79 Fed. Reg. 23,414, 23,526 (Apr. 28, 2014) (Tier 3 Rule) ("[W]e are

---

[6] Today, automakers must use a mileage-accumulation fuel containing 15% ethanol (E15) to test the durability of evaporative emission controls. 84 Fed. Reg. at 26,994, JA___.

requiring all light-duty . . . gasoline vehicles to be certified to Tier 3 standards on federal E10 test fuel."). "[A]t least some vehicles began" using E10 for emissions testing in model year 2017, and "[a]lmost all [model year] 2020 and newer vehicles must be certified for emissions testing with" the E10 fuel. 84 Fed. Reg. at 26,994, JA___.

By 2017, E10 was thus indisputably a fuel "utilized" in certification. CAA § 211(f)(1). EPA, however, did not update its 1991 definition of "substantially similar" to reflect this change. That interpretation still purported to limit the concentration of ethanol in market gasoline to roughly 7.7%.

## C.    High-Level Ethanol-Gasoline Test Fuel

In the mid-to-late 1990s, automakers began selling "flex-fuel" vehicles, or "FFVs." *See* Dep't of Transp. et al., Report to Congress: Effects of the Alternative Motor Fuels Act CAFE Incentives Policy 13, 21–23 (2002), JA___. Flex-fuel vehicles are vehicles certified to meet emission standards using both the gasoline test fuel and a "high-level ethanol-gasoline blend" test fuel containing between 80% and 83% ethanol. 40 C.F.R. §§ 1065.725, 1065.710(b). This dual-certification test procedure "ensures" that flex-fuel vehicles "are designed and calibrated" to maintain "emissions performance across the full range of potential in-use fuel formulations," meaning any mixture of "gasoline and . . . up to 83 volume percent ethanol." Tier 3 Rule, 81

Fed. Reg. at 23,529, 23,557; 40 C.F.R. § 86.1803-01 (defining "flexible fuel vehicle" as a "motor vehicle engineered and designed to be operated on a petroleum fuel and on a[n] . . . ethanol fuel, or *any mixture* of the petroleum fuel and . . . ethanol") (emphasis added).

EPA has never promulgated any rule defining the range of fuels that are "substantially similar" to the high-level ethanol test fuel.

## III.  EPA's Guidance on Mid-Level Blends Sold for use in Flex-Fuel Vehicles

A fuel blend known as "E85," containing gasoline and 51 to 83% ethanol, has long been commercially available for use in flex-fuel vehicles. Dep't of Energy, Handbook for Handling, Storing, and Dispensing E85 and Other Ethanol-Gasoline Blends 5–6 (2016) (DOE Ethanol Handbook), JA___. Over a decade ago, retailers also began using "blender pumps" to combine E85 and gasoline from two different underground storage tanks in order to sell "mid-level" blends—fuel blends that consist of gasoline and more than 15% but less than 50% ethanol. *Id.* at 6–7, JA___.

In 2006, a fuel retailers' association asked EPA for its "position on marketers selling ethanol blends other than E10 and E85 through blender pumps for use in FFVs." Letter from Margo Oge, Dir., Office of Transp. & Air Quality, EPA (Nov. 28, 2006) (2006 Oge Letter), JA___.

EPA's response unequivocally approved the practice. Margo Oge, then Director of EPA's Office of Transportation and Air Quality, wrote that:

> "*[B]lends such as E20 and E30* for use in FFVs . . . are covered under the emissions certification for an E85 FFV, and thus *are not prohibited under the Clean Air Act*. I am not aware of any federal law that prohibits the sale of such blends for use in FFVs."

*Id.* (emphases added).

Two years later, EPA's Director of Air Enforcement provided a similar response to a similar query: "The Clean Air Act does not . . . prohibit retail gasoline stations from selling gasoline blended with *up to* 85% ethanol for use in flexible-fueled vehicles or engines." Letter from Adam Kushner, Dir., Air Enforcement Div., EPA (July 31, 2008) (2008 Kushner Letter) (emphasis added), JA___.

Consistent with this guidance, when EPA prohibited "misfueling" certain vehicles and engines with gasoline containing more than 10% ethanol under CAA § 211(c)(1), it clarified that, notwithstanding these restrictions, "[n]o person shall . . . [b]e prohibited from manufacturing, selling, introducing, or causing or allowing the sale or introduction of gasoline containing greater

than 10 volume percent ethanol into any flex-fuel vehicle."[7] That rule remains in effect.

Bolstered by EPA's assurances, "[s]ignificant public and private initiatives" have sought to "expand the use of ethanol blender pumps that dispense a variety of ethanol blends for use in FFVs." Tier 3 Rule, 81 Fed. Reg. at 23,557. USDA, for example, has provided grants to install ethanol blender pumps capable of dispensing any blend of gasoline and ethanol.[8] As a result of these initiatives, hundreds of retailers across several states now sell mid-level blends to flex-fuel vehicle customers. *See, e.g.*, 2019 Minnesota E85 + Mid-blends Station Report, JA___. In response, industry has developed consensus-based practices to ensure the quality of mid-level blends. *See* Standard Practice for Blending Mid-Level Ethanol Fuel Blends for Flexible-Fuel Vehicles with Automotive Spark-Ignition Engines, ASTM D7794-18a, JA___.

---

[7] *Regulation To Mitigate the Misfueling of Vehicles and Engines With Gasoline Containing Greater Than Ten Volume Percent Ethanol and Modifications to the Reformulated and Conventional Gasoline Programs*, 76 Fed. Reg. 44,406, 44,448 (July 25, 2011), *as amended in* 79 Fed. Reg. 42,128 (July 18, 2014) (Misfueling Rule), *codified at* 40 C.F.R. § 80.1504(a)(3).

[8] *See, e.g.*, USDA Announces $210 Million To Be Invested in Renewable Energy Infrastructure Through the Biofuel Infrastructure Partnership (Oct. 28, 2015), JA___.

## IV.  THE E15 WAIVER

In 2011, EPA approved E15 for use in model year 2001 and newer light-duty vehicles under CAA § 211(f)(4). *See Partial Grant of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent*, 76 Fed. Reg. 4662 (Jan. 26, 2011) (E15 Waiver). This "partial" waiver was conditioned, however, on the finished E15 blend having an RVP "not in excess of 9.0 psi" during the ozone season. *Id.* at 4682. In an attempt to reconcile that condition with the CAA's 1-psi RVP waiver "[f]or fuel blends containing gasoline and 10 percent . . . ethanol," CAA § 211(h)(4), EPA simultaneously interpreted the 1-psi waiver statute as applying only "to fuel blends containing gasoline and 9–10% ethanol." Misfueling Rule, 76 Fed. Reg. at 44,433.

Gasoline fuels that receive a waiver of the sub-sim law's prohibition must be registered before they are "introduce[d] into commerce." CAA § 211(a). In 2012, after E15 satisfied the pre-registration health-effects and emissions testing requirements, E15 was registered as motor vehicle gasoline under § 211(b). *See* Letter from Byron Bunker, Acting Dir., Compliance Div., Office of Transp. & Air Quality, EPA (Feb. 17, 2012), JA___. No fuel blend containing more than 15% ethanol has been registered as motor vehicle gasoline.

## V.    THE E15 RULE

### A.    The E15 Rule's Solution to Allow the Year-Round Sale of E15

Under the E15 waiver and the 1-psi RVP waiver regulations, E15 had to meet a more stringent RVP standard than E10 during the summertime high ozone season. This made it impractical to sell E15 year-round, because refiners have no incentive to make specially formulated, low-volatility gasoline to accommodate E15 blending. 84 Fed. Reg. at 26,990, JA___. That was counterproductive. Gasoline's volatility "is greatest when the concentration of ethanol in gasoline is 10% by volume," and it begins to fall when ethanol increases beyond 10%. API, Determination of the Potential Property Ranges of Mid-Level Ethanol Blends 9 (2010), JA____. And "[b]y 2013, nearly all U.S. gasoline contained approximately 10% ethanol." EPA, Fuel Trends Report: Gasoline 2006-2016 4, JA___. Thus, by keeping E15 out of the fuel market, EPA's denial of a 1-psi waiver to E15 only served to ensure the continued dominance of E10, the most volatile gasoline-ethanol fuel blend. 84 Fed. Reg. at 27,011, JA___.

In the E15 Rule that is the subject of this litigation, EPA took two steps to allow the year-round sale of E15.

**RVP rule fix.** First, EPA reinterpreted CAA § 211(h)(4) as "establishing a lower limit, or floor, on the minimum ethanol content" needed to qualify for

the 1-psi RVP waiver. 84 Fed. Reg. at 26,992, JA___. Under this correct reading, any fuel blend consisting of gasoline and "at least 10 percent ethanol may receive the 1-psi waiver, including blends that contain more than 10 percent ethanol." *Id.*

But in conflict with its own interpretation of § 211(h)(4), the E15 Rule limited the 1-psi waiver to fuel blends containing "no more than 15%" ethanol. *Id.* at 27,021, JA___, *codified at* 40 C.F.R. § 80.27(d)(2). That limit is based on EPA's interpretation of the sub-sim law, as explained below. *Infra* at 21–24.

**Sub-sim law fix.** Second, to allow E15 to be sold year-round by all parties, EPA had to neutralize the E15 waiver's 9-psi RVP condition, as that condition is independently enforceable under the sub-sim law. Otherwise, while ethanol blenders would be allowed to sell E15 year-round, fuel or fuel additive manufacturers like petroleum refiners or ethanol producers would be forbidden from doing so by the sub-sim law. To avoid that anomalous result, EPA interpreted the sub-sim law, CAA § 211(f)(1), "to find that E15 is substantially similar to Tier 3 E10 certification fuel for use in [model year] 2001 and newer motor vehicles." 84 Fed. Reg. at 26,995, JA___. The new E15 Rule thus announces that "EPA will treat any gasoline-ethanol blend containing more than 10 *but no more than 15 volume percent ethanol* ("E15"), and denatured fuel ethanol used to make such a gasoline-ethanol blended fuel for

use by any person in light-duty vehicles manufactured after model year 2001 . . . as substantially similar to any unleaded gasoline or gasoline additive used in the" certification of light-duty vehicles. 84 Fed. Reg. at 27,021 (emphasis added), JA___. This definition makes the E15 waiver conditions irrelevant going forward: Now that E15 is "substantially similar" to E10, fuel manufacturers no longer need to rely on a waiver of the sub-sim law to introduce E15 into commerce, and thus no longer need to comply with the 9-psi RVP condition. CAA § 211(f)(1).

### B. The E15 Rule's Response to Comments Relating to Fuel Blends Other than E15

In the proposed rule, EPA asserted that its "proposed interpretation [was] limited to" E15 because the Agency lacked "sufficient data and information" to support extending its interpretation to higher blends or to "[o]ther oxygenates" like isobutanol. Proposed E15 Rule, 84 Fed. Reg. at 10,601 & n.126, JA___. EPA also expressly requested "comment on whether [it] should interpret sub sim to encompass other oxygenates and request[ed] any supporting data on the potential effects of other oxygenates on emissions, materials compatibility, and driveability of Tier 3 vehicles." *Id.*

During the comment period, several commenters, including petitioners, argued that test data and other evidence demonstrate that at a minimum, fuel

blends consisting of gasoline and 20% ethanol or 16% isobutanol are "substantially similar" to the E10 test fuel under EPA's own interpretation of § 211(f)(1). Modifications to Fuel Regulations To Provide Flexibility for E15; Modifications to RFS RIN Market Regulations: Response to Comments, EPA-420-R-19-004 at 31 (May 2019) (Response to Comments), JA___.

But in the final rule, EPA ignored its own invitation to comment and treated all such comments as "outside the scope of this action," offering no substantive response. Response to Comments 31, JA___.

## C.     The E15 Rule's Treatment of Mid-Level Ethanol Blends

In the preamble to the proposed E15 Rule, EPA sought to clarify who is a "fuel manufacturer" under CAA § 211, and thus subject to the sub-sim law, as well as who is eligible for the 1-psi RVP waiver. Proposed E15 Rule, 84 Fed. Reg. at 10,593–95, JA___. According to EPA's interpretation of the law and the applicable regulations:

> A party who unlawfully adds [ethanol] in a volume that exceeds the [ethanol] content limit in the interpretative definition of "substantially similar" . . . is a fuel manufacturer, and does not receive the 1-psi waiver for fuels containing at least 10 percent ethanol.

*Id.* at 10,594, JA___.

Under this interpretation, any person, including any retailer, who blends more than 15% ethanol into gasoline qualifies as a "fuel manufacturer" liable under the sub-sim law. And because such fuels are "unlawful" under the sub-sim law, they are also, according to EPA, not eligible for the 1-psi waiver in CAA § 211(h)(4).

The final E15 Rule confirms this interpretation. Consistent with the proposed rule, the E15 Rule's definition of "substantially similar" confirms that any blend with "more than 15 volume percent ethanol" is not, in EPA's view, "substantially similar" to the E10 test fuel. 84 Fed. Reg. at 27,021, JA___. The E15 Rule reiterates that any party who adds more than 15% ethanol to gasoline is not "add[ing] oxygenate in an allowable amount" under the sub-sim law, and is thus liable as a fuel manufacturer. *Id.* at 27,009, JA___. And based on its conclusion that fuel blends with more than 15% ethanol are not "substantially similar," the final E15 Rule limits the 1-psi RVP waiver to fuel blends containing "no more than 15%" ethanol, subjecting mid-level blends to a more stringent volatility standard than E10 and E15. *Id.* at 27,021, JA___, *codified at* 40 C.F.R. § 80.27(d)(2); Response to Comments 6 & n.1 (concluding that "the 1-psi waiver is . . .applicable to gasoline-ethanol blends the agency finds are [substantially similar]," and noting "that gasoline-ethanol

blends higher than E15" are not substantially similar and therefore cannot "be introduced into commerce at 10.0 psi"), JA___.[9]

The E15 Rule's interpretation of the sub-sim law forbids retailers from selling mid-level blends for use in any motor vehicle, including flex-fuel vehicles certified for such blends. If, as the E15 Rule asserts, such retailers are gasoline "fuel manufacturers," they must comply with the fuel registration obligations of § 211(a). And if, as the E15 Rule also asserts, the registration obligations "apply regardless of whether gasoline is labeled for use in gasoline-fueled vehicles and engines or flexible-fueled vehicles," it is of no moment that mid-level blends are sold for use in flex-fuel vehicles. Response to Comments 53, JA___. Mid-level blends must be registered. But mid-level blends cannot be registered under unless they first can be introduced into commerce under the

---

[9] The E15 Rule asserts that mid-level blends are regulated "gasoline" under § 211 and the implementing regulations in 40 C.F.R. Parts 79 and 80. 84 Fed. Reg. at 26,981 n.2 ("[G]asoline-ethanol blended fuels containing no more than 50 volume percent ethanol are defined as gasoline under EPA's Regulations."), JA___. Petitioners have filed a request for administrative reconsideration or rulemaking asking EPA to, among other things, clarify that mid-level blends are not regulated "gasoline." Petition for Reconsideration or Rulemaking 2–3, 16–17, JA___. EPA has not acted on that petition.

This Court subsequently severed the issue of whether mid-level blends are regulated "gasoline" from this case and is holding that issue in abeyance while the administrative petition is pending. Order (Jan. 8, 2020), Dkt. #1823237. Thus, for purposes of this litigation, petitioners assume, without conceding, that mid-level ethanol blends are regulated "gasoline."

sub-sim law. 40 C.F.R. § 79.11(i). EPA's interpretation of the sub-sim law thus amounts to a prohibition on the sale of mid-level blends, even for use in flex-fuel vehicles.

## SUMMARY OF ARGUMENT

I. The sub-sim law does not prohibit the sale of mid-level blends for use in motor vehicles, because ethanol is a "fuel additive" utilized in the gasoline certification fuels. The ethanol additive sold in the market is indistinguishable from the ethanol added to the gasoline certification fuels. *A fortiori*, ethanol is "substantially similar" to a fuel additive utilized in certification, and thus increasing the concentration of ethanol in gasoline does not violate the sub-sim law.

A. EPA does not dispute that ethanol in the market is chemically identical to the ethanol used as a fuel additive in certification. It instead concludes that, for purposes of the sub-sim law, ethanol is not a fuel additive but a fuel property, which it may regulate when defining the range of fuels that are "substantially similar" to the E10 test fuel. This conclusion is contrary to the plain language and structure of the sub-sim law and the related provisions of § 211, which make clear that ethanol is an "additive." It is also arbitrary and capricious because it contradicts other parts of the E15 Rule itself, and because

it silently departs from EPA's precedent treating ethanol as an additive under the sub-sim law.

B. In the alternative, EPA asserts that it may regulate the concentration of chemically and physically identical fuel additives under the sub-sim law, because a fuel additive that is substantially similar to a certification fuel additive at one concentration may no longer be substantially similar at a higher concentration. This argument violates the plain language of the statute, which limits the concentration of fuel additives only if they are *not* substantially similar. The ethanol used to make E15 does not become any less similar to the ethanol in certification fuel when it is intended to make gasoline with more than 15% ethanol. EPA can, and does, control ethanol concentration in fuel under other provisions of the CAA, but that authority cannot be found in the sub-sim law.

II. The sub-sim law does not prohibit the sale of mid-level blends for the additional reason that such fuel blends are also "substantially similar" to the high-level ethanol-gasoline test fuel used to certify flex-fuel vehicles. Mid-level blends are "substantially similar" to the high-level ethanol-gasoline blend test fuel because, when used in flex-fuel vehicles certified on such a fuel, they meet EPA's own criteria for defining "substantially similar": compared to the high-level ethanol-gasoline test fuel, mid-level blends do not raise flex-fuel vehicle

emissions, do not affect the durability of flex-fuel vehicle emission controls, and do not impair flex-fuel vehicle performance. Because mid-level blends are "substantially similar" to the high-level ethanol-gasoline test fuel, they may be introduced into commerce without violating the sub-sim law.

EPA's contrary interpretation of the sub-sim law would forbid retailers from selling mid-level blends even for use in flex-fuel vehicles, contradicting longstanding Agency guidance that has induced substantial industry reliance interests. That self-contradiction is an arbitrary and capricious action in its own right, because the Agency failed to consider serious reliance interests or even to acknowledge the E15 Rule's departure from EPA's prior guidance.

IV. EPA invited, and then ignored, comments and data showing that fuel blends consisting of gasoline and 20% ethanol ("E20") or 16% isobutanol ("I16") were "substantially similar" to the E10 test fuel. That violated EPA's statutory duty to consider significant comments, because the comments were relevant to the E15 Rule and, if adopted, would have required EPA to alter the final rules by raising the E15 ceiling and also allowing I16. EPA argues that the comments it expressly invited fell outside of the scope of the rulemaking because the President had directed EPA to allow the sale of E15. But adopting these comments would have been consistent with the President's directive. And in any event, the President's directive does not excuse EPA's failure to

respond to relevant comments or to exercise reasoned judgment when defining the range of fuels that are "substantially similar."

## STANDING

To have standing, Petitioners must suffer an injury in fact caused by the E15 Rule and redressable by the Court. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992).

"The Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 561–62). That is the case here.

Petitioners include ethanol producers and fuel retailers directly regulated by the E15 Rule. They wish to sell mid-level blends but are impeded from doing so by the E15 Rule's various restrictions on the sale of mid-level blends. *See* Addendum A-1, A-2. If Petitioners violate these restrictions, they risk draconian civil penalties. *See* CAA § 211(d)(1); 40 C.F.R. § 19.4, Table 2 ($47,537 per day). The E15 Rule likewise injures Petitioner ethanol producers because they produce biofuel additive products that would be sold in greater volumes if the restrictions on ethanol and isobutanol additives were lifted. Addendum A-2.

These injuries would be redressed by a judgment of this Court holding that the E15 Rule's prohibition of fuel blends with more than 15% ethanol is unlawful, or holding that EPA must consider on remand whether fuel blends consisting of gasoline and 20% ethanol or 16% isobutanol are "substantially similar" to any fuel utilized in certification.

## STANDARD OF REVIEW

The Court must set aside final EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." CAA § 307(d)(9)(A).

The Court often reviews EPA interpretations of the CAA under the *Chevron* framework. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984). That framework is inapplicable to the legal issues raised in this brief. To justify *Chevron* deference, an agency must interpret the statute in a manner that shows an intent to "exercise . . . lawmaking authority" to fill a statutory gap left by Congress. *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 54 (D.C. Cir. 2018). In response to Petitioners' argument that the sub-sim law does not restrict the concentration of ethanol in gasoline, EPA defended its decision to control ethanol's concentration under the sub-sim law solely as the "best reading of the statute." Response to Comments 30, JA___. That makes *Chevron* inapplicable to the issues raised in this brief. *See Neustar, Inc. v. FCC*,

857 F.3d 886, 894 (D.C. Cir. 2017) (FCC forfeited *Chevron* deference by failing to invoke it in the "relevant agency orders").

Agency action is "arbitrary and capricious if the agency" (1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency, or" (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action is also arbitrary and capricious when it is "internally inconsistent and inadequately explained." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987). When an agency departs from its own precedent, the agency must also "at least 'display awareness that it is changing position,' " provide " 'good reasons for the new policy,' " and take into account any "serious reliance interests" affected by the change in agency policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)).

# ARGUMENT

## I. THE SUB-SIM LAW DOES NOT PROHIBIT MID-LEVEL BLENDS, BECAUSE ETHANOL IS A FUEL ADDITIVE UTILIZED IN CERTIFICATION.

In the E15 Rule, EPA established a "no more than 15 volume percent ethanol" ceiling based on a broad reading of the sub-sim law that is contrary to the text and structure of the statute.

The sub-sim law makes it "unlawful" for regulated manufacturers "to increase the concentration in use of, any . . . fuel additive," but only if the fuel additive "is not substantially similar to any . . . fuel additive utilized in the certification of any model year 1975" or later "vehicle or engine." CAA § 211(f)(1)(B).

A faithful reading of this text requires the conclusion that mid-level blends are not "unlawful" under the sub-sim law, because ethanol has been a "fuel additive utilized in" the certification of motor vehicles since at least 2017. No one denies that the ethanol sold in the marketplace is identical to the ethanol used in certification. Because market ethanol is identical to the ethanol utilized in certification, it is necessarily "substantially similar." This means that the sub-sim law does not prohibit manufacturers from "increas[ing] the concentration in use of" ethanol in any fuel "for use by any person in motor vehicles." CAA § 211(f)(1)(B). But that is what the E15 Rule does by imposing

a "no more than 15 volume percent ethanol" ceiling on the concentration of ethanol additive in gasoline. 84 Fed. Reg. at 27,021, JA___.

EPA does not dispute that ethanol used in the market is physically and chemically indistinguishable from ethanol used in certification. Instead, EPA offers two responses.

First, EPA denies that ethanol is a "fuel additive" for purposes of the sub-sim law. Response to Comments 29, JA___. Instead, EPA characterizes ethanol "as a fuel property," which it may control. *Id.* at 30, JA___.

Second, EPA asserts in the alternative that "the best reading of the statute" is that "manufacturers are prohibited from introducing into commerce a fuel additive, or increasing its concentration in use, unless it is substantially similar, in both physical and chemical characteristics *and concentration*," to another fuel additive used in certification. *Id.* at 30 (emphasis added).

These responses are not entitled to *Chevron* deference for the reasons given above, *see supra* at p.28, and they lack merit.

## A. Ethanol is a "fuel additive" utilized in certification.

In an effort to escape the plain meaning of CAA § 211(f), EPA argues that "in this case, ethanol is not appropriately considered a fuel additive" for purposes of the sub-sim law. Response to Comments 29, JA___. EPA asserts that "E10 and E15 are fuels and we do not treat the various components of

those fuels as 'fuel additives.' " *Id.* EPA then says that allowing the use of ethanol as a fuel additive in any concentration "would run counter to the stated [c]ongressional purpose in enacting [the sub-sim law]—to protect emissions systems from harm due to the unrestricted use of fuel or fuel additives." *Id.* To further this stated purpose, EPA concludes "that ethanol is not appropriately considered a fuel additive." *Id.* Instead, EPA says, "ethanol content is limited as a fuel property, not as an additive." *Id.* at 30, JA___.

EPA's position that ethanol is not a fuel additive "in this case" is contrary to law and arbitrary and capricious. It is contrary to law because the plain meaning of "fuel additive" and related provisions of CAA § 211 confirm that ethanol is a fuel additive. It is arbitrary and capricious because it is internally inconsistent and silently departs from EPA's interpretation of "fuel additive."

1. *EPA's finding that ethanol is not a "fuel additive" is contrary to law.*

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mkt'g Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). As relevant here, a gasoline "additive" is defined by a contemporary dictionary as "a chemical (as an antiknock agent or an agent for counteracting deposits on

spark plugs) added to gasoline." Webster's (Third) Int'l Dictionary 24 (1966). This dictionary gives the example of "tetraethyl lead." *Id.* This ordinary usage of "additive" includes ethanol added to gasoline: ethanol is a clean substitute for hazardous anti-knock gasoline additives like tetraethyl lead or MTBE. Indeed, § 211 expressly lists ethanol as one of several gasoline "fuel additives" that could replace MTBE. CAA § 211(b)(4)(A)(i)(VI). And EPA itself has noted that when ethanol is added to gasoline, "ethanol is being used as a fuel additive." EPA Report to Congress on Public Health, Air Quality, and Water Resource Impacts of Fuel Additive Substitutes for MTBE 56 (2009), JA___.

Other canons of interpretation support reading "fuel additive" to include ethanol.

The "normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (quotation marks omitted). Courts should particularly strive to avoid interpretations that give the same word "two different meanings in the same section of the statute." *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980). That canon is relevant here, because EPA does not dispute that under CAA § 211(a), (b), and (e), the term "fuel additive" "as defined under [its] 40 CFR part 79 regulations would encompass ethanol." Response to Comments 29, JA___. EPA's rules define "additive" in

these provisions to mean "any substance, other than one composed solely of carbon and/or hydrogen, that is intentionally added to a fuel named in the designation . . . and that is not intentionally removed prior to sale or use." 40 C.F.R. § 79.2(e). EPA admits, as it must, that ethanol falls squarely within its definition of "additive": ethanol is composed of carbon, hydrogen, *and* oxygen, and it is intentionally added to "motor vehicle gasoline," a "fuel" that EPA has "named in the designation." *See id.* § 79.32(a)(1). But EPA wants to interpret "additive" in § 211(f) to exclude ethanol, running against the canon of consistent usage. Response to Comments 29, JA___.

While the canon of consistent usage may yield to context, context reinforces its application here. CAA §§ 211(a), (b), (c)(1), (e), and (f), this Court has observed, are interrelated parts of a comprehensive "scheme" to control fuels and fuel additives. *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995) (*Ethyl II*). Such a scheme "should not be read as a series of unrelated and isolated provisions." *Gustafson*, 513 U.S. at 570. The provisions should instead "be interpreted together, as though they were one law." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 252 (2012).[10]

---

[10] EPA has always implicitly recognized that the various terms used in § 211 should be interpreted alike. The E15 Rule, for example, interprets the term "manufacturer" in the sub-sim law and the registration provisions to have the

(*footnote continued on next page*)

Failure to follow the canon of consistent usage would sow disharmony in the regulatory treatment of ethanol under CAA § 211. For instance, ethanol producers must register the ethanol they sell for use in motor vehicle gasoline as an additive. 40 C.F.R. § 79.31(a). To do so, they must certify that the ethanol is "substantially similar to any *fuel additive*" used in certification or that it has obtained a waiver under the sub-sim law. *Id.* § 79.21(h) (emphasis added). If ethanol is not a fuel additive under the sub-sim law, it is unclear how ethanol producers could meet this prerequisite to sell ethanol for use in E15: there would be no gasoline "fuel additive" to compare their ethanol products to.

The prior-construction canon also supports interpreting "fuel additive" to include ethanol. Language that is "obviously transplanted from another legal source . . . brings the old soil with it." *Stokeling* v. *United States*, 139 S. Ct. 544, 551 (2019) (citation omitted) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). Thus, "[w]hen administrative . . . interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates,

---

same meaning. *See* 84 Fed. Reg. at 27,009, JA___ ("[W]e interpret CAA sec. 211(f) as applying . . . to fuel and fuel additive manufacturers as defined in 40 CFR 79.2.").

as a general matter, the intent to incorporate its administrative . . . interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). EPA promulgated its definition of "fuel additive" in 1975. 40 Fed. Reg. at 52,011. Two years later, Congress enacted the sub-sim law, borrowing the term "fuel additive." Under the prior-construction canon, then, the sub-sim law "is presumed to carry forward" EPA's definition of "fuel additive." Scalia & Garner, *supra* at 322. That 1975 definition of fuel additive, EPA admits, includes ethanol added to gasoline. Response to Comments 29, JA___.

Yet another canon supports this interpretation. It is a fundamental rule of interpretation that "[a] court should give effect, if possible, to every clause and word of a statute." *See Moskal v. United States*, 498 U.S. 103, 109 (1990) (quotation marks omitted). If EPA could simply deem any "fuel additive" to be a "fuel property," and then regulate it through its "substantially similar" definition for fuel, the statute's reference to "fuel additive" and to "increas[ing] the concentration in use" of a "fuel additive" would be redundant. Congress could just as well have said that all fuels are unlawful unless they are substantially similar to a certification test fuel, omitting any reference at all to fuel additives used in the certification test fuel. Congress did not do so.

In the face of these interpretive canons, the only argument EPA marshals against reading "fuel additive" to include ethanol is that this "would

run counter to the" congressional purpose of "protect[ing] emissions systems from harm due to the unrestricted use of fuel or fuel additives." Response to Comments 29, JA___. But as the Supreme Court has said, "no legislation pursues its purposes at all costs," and "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam).

Recognizing this nuance, this Court rejected similar purposive reasoning in *Lubrizol Corporation v. EPA*, 562 F.2d 807 (D.C. Cir. 1977). In *Lubrizol*, EPA interpreted the phrase "fuel and fuel additive" in § 211 broadly to require the registration of motor oil and its additives, reasoning that this would further Congress's stated purpose of controlling substances that may increase vehicle emissions. *Id.* at 811. This Court disagreed. It referred to the dictionary, interpreted "fuel" according to "its common sense [dictionary] meaning," and concluded that the statutory reference to "fuel" did not include motor oil. *Id.* at 816–19. The Court rejected EPA's purposive reading as contrary to ordinary methods of statutory construction and noted that Congress "did not expect [§ 211] to reach many potential causes of pollution, including motor oils and motor oil additives." *Id.* at 818.

EPA's interpretation of "fuel additive" in this case is no sounder than its interpretation of the term "fuel" in *Lubrizol*. As in *Lubrizol*, there is no reason to think Congress gave EPA discretion to contort the ordinary meaning of "fuel additive" as it sees fit in order to prevent any possible risk to vehicle emission controls, no matter the cost. If Congress wanted to prevent any risk of harm to emission controls at any cost, it would not have exempted substantially similar fuels or fuel additives from the § 211(f)(4) waiver requirements. EPA's position that ethanol may be regulated as a "fuel property," instead of a "fuel additive," therefore fails on the merits.

2. *EPA's finding that ethanol is not a "fuel additive" is arbitrary and capricious.*

EPA's conclusion that ethanol is not a fuel additive is not just contrary to law; it is also arbitrary and capricious because it is contrary to other parts of the E15 Rule and to EPA's own prior sub-sim rules, a conflict EPA simply ignores.

First, EPA's finding is internally inconsistent. The E15 Rule's sub-sim definition recognizes that "denatured fuel ethanol" is a "gasoline additive," and it allows the use of denatured fuel ethanol to make E15. 84 Fed. Reg. at 27,021, JA___. After allowing the use of "denatured fuel ethanol" to make E15, the E15 Rule then allows the use of "*[a]dditional* fuel additive(s) at a

concentration of no more than 1.0 percent." *Id.* (emphasis added). The E15 Rule would not have used the word "additional" if denatured fuel ethanol were not itself a fuel additive. The E15 Rule's sub-sim definition thus treats ethanol as a fuel additive, not just a "fuel property," contradicting EPA's response to comments. EPA's "internally inconsistent" finding that ethanol is not a fuel additive is thus arbitrary and capricious. *See Gen. Chem. Corp.*, 817 F.2d at 857.

Second, EPA's response silently departs from prior sub-sim rules that treated ethanol as a fuel additive, not just a fuel property. When EPA first defined "substantially similar" in 1980, the Agency noted that "[a]liphatic [a]lcohols," which include ethanol, could be used as gasoline "fuel additives." 1980 Sub-Sim Rule, 45 Fed. Reg. at 67,447; *see also* 1981 Sub-Sim Rule, 46 Fed. Reg. at 38,584 (explaining that "*the total additive content other than* hydrocarbons, *aliphatic alcohols* and aliphatic ethers," was limited to "no more than 0.25 percent." (emphases added)).

Past sub-sim rules also relied on the regulatory definitions "published at 40 CFR 79.2" to define the terms of the sub-sim law. 1980 Sub-Sim Rule, 45 Fed. Reg. at 67,447. These definitions include a definition of "additive" which, EPA concedes, "would encompass ethanol." Response to Comments 29, JA___. Although EPA now wants to escape its regulatory definition of "fuel

additive," it failed to "at least 'display awareness that it is changing position' " about its prior reliance on the Part 79 definitions under the sub-sim law. *Encino*, 136 S. Ct. at 2126 (quoting *Fox Television*, 556 U.S. at 515).

Because EPA's finding that ethanol is not a fuel additive is arbitrary and capricious, EPA "does not receive *Chevron* deference in the interpretation of" the term "fuel additive." *Encino Motorcars*, 136 S. Ct. at 2127. Indeed, EPA's interpretation of the term "fuel additive" is not even entitled to *Skidmore* deference, as it is ill-considered, poorly reasoned, and inconsistent "with earlier and [contemporaneous] pronouncements." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

### B.  The sub-sim law does not limit the concentration of substantially similar fuel additives.

EPA asserts in the alternative that "the best reading of the statute," CAA § 211(f), is that "manufacturers are prohibited from introducing into commerce a fuel additive, or increasing its concentration in use, unless it is substantially similar, in both physical and chemical characteristics *and concentration*" to a fuel additive used in certification. Response to Comments at 30, JA___ (emphasis added). "Because additives can have different effects at different concentrations," EPA argues, the sub-sim law "could not possibly allow unlimited increasing concentrations for any fuel additive that is sub sim to one

utilized in certification." *Id.* at 29, JA___. This interpretation contradicts the text of the statute.

The sub-sim law exempts any "fuel additive" that is "substantially similar" to any "fuel additive utilized" in certification. And ethanol is surely "similar" to ethanol. The word "similar" means "having characteristics in common"; "very much alike." Webster's (Third) Int'l Dictionary 2120 (1966). Whatever range of meanings the word "similar" may bear, it cannot reasonably be interpreted to exclude fuel additives that are not just "very much alike," but are in fact *identical* to fuel additives used in certification. Liquid compounds do not become different "additives" based on their concentration in a fuel mixture. By definition, "[e]ach substance in a mixture retains its chemical identity and properties." Theodore L. Brown et al., Chemistry 10 (12th ed. 2012). Thus, just as no scientist or speaker of English would say that gin ceases to be gin if added to tonic water in a greater or lesser concentration, no scientist or speaker of English would say that ethanol ceases to be ethanol if added to a fuel at a concentration of 16% instead of 15%.

Interpretive canons confirm that EPA may not restrict the concentration of sub-sim fuel additives. "[W]hen 'Congress includes particular language in one section of a statute but omits it in another,'—let alone the very next provision—[courts] 'presume' that Congress intended a difference in

meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (alteration omitted) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). In CAA § 211(f)(4), Congress gave EPA authority to waive the sub-sim law's prohibition for a fuel additive "or a specified concentration thereof." By contrast, § 211(f)(1) lacks any similar language that would allow EPA to determine that only a "specified concentration" of a fuel additive is "substantially similar." The express reference to a "specified concentration" of a fuel additive in § 211(f)(4), and the omission of any similar language from the "substantially similar" exemption in § 211(f)(1), emphasizes what is already clear from the plain meaning of § 211(f)(1)—that EPA lacks authority to restrict the concentration of "substantially similar" fuel additives under § 211(f)(1).

EPA resorts to arguing that the sub-sim law "could not possibly" mean what it says because different concentrations of additives may have different effects on emissions. But as EPA itself has previously explained, the "substantially similar" exemption "does not directly address the emissions effects of the use of the fuel or additive." 1980 Sub-Sim Rule, 45 Fed. Reg. at 67,445. The sub-sim law exempts any fuel additives substantially similar to those used in certification from the sub-sim waiver process, in part because, as EPA has explained, such fuel additives "consist primarily of materials which

are already present in the exhaust" during vehicle testing, and unlike lead, manganese or other atypical elements that could attack catalysts, their emission products "should have no effect on" or should pose little risk to "catalyst performance." *Id.* at 67,446. Congress had to balance the risk of increased emissions against the countervailing risk that, under a burdensome licensing regime, "the public and this nation would suffer from lack of innovation in fuels and fuel additives, to the ultimate detriment of air quality and our national security." *American Methyl Corp. v. EPA*, 749 F.2d 826, 840 (1984).[11] It did so by exempting all "substantially similar" fuel additives from the sub-sim law, regardless of their concentration.

Moreover, CAA § 211(f) does not exist in a legal vacuum. If higher ethanol concentrations pose serious risks to vehicle emission controls or public health, EPA has ample regulatory tools at its disposal under the CAA to limit high concentrations of ethanol (or any other fuel additive) in gasoline.

First, manufacturers may only sell "motor vehicle gasoline" with more than 15% ethanol for general use in motor vehicles after satisfying the detailed

---

[11] The delays attendant to the 211(f)(4) process are illustrated by MMT. It took over 17 years for MMT to receive a waiver under § 211(f)(4). *See Ethyl II*, 51 F.3d at 1056 ("Ethyl submitted its first waiver application on March 17, 1978."); *Fuels and Fuel Additives; Grant of Waiver Application*, 60 Fed. Reg. 36,414 (July 17, 1995) (granting waiver).

emissions and health-effects testing registration requirements imposed by EPA under § 211(e) of the CAA. *See* 40 C.F.R. §§ 79.11(j), 79.21(i), 79.51(c)(3), 79.56(e)(3)(i)(B), 79.56(e)(4)(ii)(A)(iii) (requiring the submission of testing data to register a "new" gasoline fuel with an ethanol concentration exceeding 15%); *see also* 2008 Kushner Letter (mid-level blends must be registered when sold "for use in gasoline-only vehicles"), JA___.

Second, EPA may limit ethanol under § 211(c)(1) if some concentration of ethanol in gasoline "causes, or contributes to, air pollution . . . that may reasonably be anticipated to endanger the public health or welfare" or (2) causes "emissions products" that "impair to a significant degree the performance of any emission control device or system. CAA § 211(c)(1). Indeed, EPA has already exercised this authority to prohibit the use of gasoline with more than 10% ethanol in "any model year 2000 or older light-duty gasoline motor vehicle, any heavy-duty gasoline motor vehicle or engine, any highway or off-highway motorcycle, or any gasoline-powered nonroad engines, vehicles or equipment." 40 C.F.R. § 80.1504(a)(1); Misfueling Mitigation Rule, 76 Fed. Reg. at 44,411 (citing CAA § 211(c)(1)). Subsection § 211(c)(1) and the rules implementing it would continue to apply regardless of how the Court interprets the sub-sim law.

Third, EPA has speculated that the use of mid-level blends in certain vehicles may also run afoul of the CAA's "anti-tampering" law, which makes it illegal "for any person knowingly to . . . render inoperative" any motor vehicle emission controls. CAA § 203(a)(3)(A); 2006 Oge Letter, JA___; 2008 Kushner Letter, JA___.

In light of the numerous statutory tools EPA has at its disposal to limit the concentration of fuel additives, including ethanol, EPA offers no reason to conclude that Congress could not have possibly meant what it said.

## II. THE SUB-SIM LAW DOES NOT PROHIBIT MID-LEVEL BLENDS, BECAUSE THEY ARE "SUBSTANTIALLY SIMILAR" TO THE HIGH-LEVEL ETHANOL-GASOLINE TEST FUEL.

EPA's argument that it may limit the concentration of ethanol as a "fuel property" under the sub-sim law fails for another reason: Under EPA's own sub-sim criteria, mid-level blends are "substantially similar" to the "high-level ethanol-gasoline blend" test fuel used to certify flex-fuel vehicles. 40 C.F.R. § 1065.725. Indeed, the opposite interpretation would contradict prior EPA guidance and overturn serious industry reliance interests.

### A. Mid-level blends are "substantially similar" to the high-level gasoline-ethanol test fuel.

To determine whether a fuel is "substantially similar," EPA considers whether—compared to "*any* fuel . . . utilized in the certification of *any* . . .

vehicle," CAA § 211(f)(1)(B)—the candidate fuel has similar effects on (1) emissions; (2) the durability of vehicle emission controls; and (3) a vehicle's performance or "driveability." 84 Fed. Reg. at 26,997, JA___. These criteria are "linked" because "they are intended to answer the same question: Whether a fuel[] . . . will harm emission controls on vehicles and engines or result in increases in regulated emissions." *Id*. When determining whether a fuel is "substantially similar," EPA does not consider the fuel's compatibility with *every* type of motor vehicle, as that would make the sub-sim law unworkable. (No fuel is compatible with all motor vehicles.) Instead, as the E15 Rule explains, "[i]n assessing whether a fuel is substantially similar to a certification fuel, [EPA] must look only to its use in the engines and vehicles within which it can be used, and not its use in vehicles and engines which are fueled by other types of fuel." *Id.*

Mid-level blends are "substantially similar" to high-level ethanol-gasoline test fuel under these criteria. Flex-fuel vehicles are the only vehicles certified to operate on high-level ethanol-gasoline test fuel, so only they could be the relevant unit of analysis for purposes of the "substantially similar" criteria. When used in flex-fuel vehicles, mid-level ethanol blends do not pose any risk to compliance with emission standards, because flex-fuel vehicles are designed to maintain "emissions performance across the full range of potential

in-use fuel formulations," meaning any mixture of "gasoline and . . . up to 83 volume percent ethanol." Tier 3 Rule, 81 Fed. Reg. at 23,529, 23,557. Nor do they pose any risk to vehicle emission controls or driveability: as the Department of Energy has explained, "FFVs can run on E85, gasoline, or any blend of the two, without adverse effects on fuel system and engine materials, onboard diagnostics systems, or driveability." DOE Ethanol Handbook 16, JA___. Mid-level blends are thus "substantially similar" to the high-level ethanol-gasoline test fuel under all of the criteria that EPA considers, so they are not "unlawful" under the sub-sim law.

### B.     A contrary interpretation would overturn serious industry reliance interests.

The conclusion that mid-level blends are substantially similar to the high-level ethanol-gasoline test fuel is consistent with prior EPA guidance on mid-level blends. EPA stated in 2006 that "blends such as E20 and E30 for use in FFVs . . . are covered under the emissions certification for an E85 FFV, and thus are not prohibited under the Clean Air Act." 2006 Oge Letter, JA___. This statement would make no sense unless mid-level blends are "substantially similar" to the high-level ethanol-gasoline test fuel used to certify flex-fuel vehicles; fuels that are *not* sub-sim *are* by definition prohibited under the Clean Air Act, unless granted a waiver under § 211(f)(4).

47

By contrast, EPA's view that mid-level blends are unlawful under the sub-sim law cannot be reconciled with prior guidance that has induced serious reliance. Under EPA's interpretation of the sub-sim law, hundreds or thousands of fuel retailers who relied on EPA's assurances to invest in blender pumps and sell mid-level blends for over a decade have been selling illegal fuels under § 211 and are liable for enormous civil penalties. *See* CAA § 211(d)(1); 40 C.F.R. § 19.4, Table 2 ($47,357 per day).

Such a result is arbitrary and capricious because it upsets reasonable expectations without acknowledging past guidance or the "serious reliance interests" it induced. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1114 (D.C. Cir. 2019). When an agency reverses a prior interpretation of the law or policy, it must offer a "reasoned explanation" for the change that includes reasons "for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 516. Where "serious reliance interests [are] at stake," an agency must offer more than "conclusory statements" to defend the change. *Encino*, 136 S. Ct. at 2127. In the E15 Rule, EPA did not even acknowledge that it was changing position, much less explain why it abandoned its 2006 policy or why it was disregarding serious reliance interests.

EPA's interpretation is arbitrary and capricious for an additional reason: it treats E85 and mid-level blends differently for purposes of the sub-sim law for no identifiable policy reason. E85 would still be allowed into commerce because the Agency says it is not regulated "gasoline." Mid-level blends, by contrast, would be shut out, even though flex-fuel vehicles are designed to meet EPA's standards on both fuels. The Court "must reverse an agency policy when [it] cannot discern a reason for it." *Judulang v. Holder*, 565 U.S. 42, 64 (2011). No reason anchored in the sub-sim law's text, history, or purpose supports EPA's disparate treatment of E85 and mid-level blends for use in flex-fuel vehicles.

### C.    Because mid-level blends are not prohibited by the sub-sim law, the E15 Rule's restrictions on mid-level blends are unlawful.

EPA's erroneous interpretation of the sub-sim law was critical to the E15 Rule's 15% ceiling on ethanol concentration. If mid-level ethanol blends are "substantially similar" to the high-level ethanol-gasoline test fuel used in certification, they may be lawfully introduced into commerce for use by any person in motor vehicles under the sub-sim law. CAA § 211(f)(1). As a result, all of the E15 Rule's restrictions on fuel blends with more than 15% ethanol are unlawful, because they are all premised on the erroneous legal conclusion that such fuels are prohibited by the sub-sim law. *See* Proposed E15 Rule, 84

Fed. Reg. at 10,594 (asserting that fuel blends that are not substantially similar "do[] not receive the 1-psi waiver for fuels containing at least 10 percent ethanol."), JA___; Response to Comments 6 & n.1 (concluding that "the 1-psi waiver is . . .applicable to gasoline-ethanol blends the agency finds are [substantially similar]," and noting "that gasoline-ethanol blends higher than E15" are not substantially similar and therefore cannot "be introduced into commerce at 10.0 psi"), JA___.

The rule is accordingly arbitrary and capricious because it is contrary to law and fails to address " 'serious reliance interests' " induced by EPA's prior guidance. *Nat'l Lifeline Ass'n*, 921 F.3d at 1114 (order was arbitrary and capricious because agency failed to address, *inter alia*, serious reliance interests engendered by its policy of forbearance).

### III. EPA FAILED TO CONSIDER COMMENTS AND EVIDENCE DEMONSTRATING THAT FUEL BLENDS CONTAINING GASOLINE AND 20% ETHANOL OR 16% ISOBUTANOL ARE "SUBSTANTIALLY SIMILAR" TO E10 CERTIFICATION FUEL.

In the notice of proposed rulemaking, EPA explained that its proposed "interpretation" of the sub-sim law was "limited to gasoline that contains only ethanol content up to 15 percent as this is the only oxygenate that we have sufficient data and information to support at this time." 84 Fed. Reg. at 10,601, JA___; *see also id.* at 10,601 n.126 ("[A]s stated, we believe we only have data

and information to support an interpretation for gasoline containing only ethanol up to 15 volume percent."), JA___. EPA also noted that "[o]ther oxygenates (notably isobutanol)" could also be substantially similar to the E10 test fuel, and it therefore requested "comment on whether we should interpret sub sim to encompass other oxygenates and request any supporting data on the potential effects of other oxygenates on emissions, materials compatibility, and driveability of Tier 3 vehicles." *Id.* at 10,601, JA___. EPA received detailed comments submitting data that showed fuel blends consisting of gasoline and 20% ethanol (E20) or 16% isobutanol (I16) are "substantially similar" to the E10 emissions test fuel under all the relevant criteria that EPA considers. Comments of Urban Air Initiative et al. 13–31, JA____; Comments of Gevo, JA____. But in the final rule, EPA treated all such comments as "outside the scope of this action," offering no substantive response. Response to Comments 31, JA___. That violated EPA's statutory duty to consider significant comments, and it was arbitrary and capricious.

## A.    The comments were significant.

Under the CAA, EPA has a duty respond "to each of the significant comments, criticisms, and new data submitted." CAA § 307(d)(6)(B). "Significant comments are those 'which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an

agency's proposed rule.' " *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (emphasis omitted) (quoting *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 n.58 (D.C. Cir. 1977)). Measured by this standard, the comments arguing that E20 and I16 were "substantially similar" to the E10 test fuel were "significant," and EPA had a duty to respond.

First, the comments were "relevant" to the agency's decision. EPA decided to limit the sub-sim rule to "any gasoline-ethanol blend containing more than 10 *but no more than* 15 volume percent ethanol." 84 Fed. Reg. at 27,021 (emphasis added), JA___. EPA's justification for this limit was that at the time of the proposal, it "only ha[d] data and information to support an interpretation for gasoline containing only ethanol up to 15 volume percent." 84 Fed. Reg. at 10,601 n.126, JA___. The comments submitting data on E20 and I16 undermined EPA's central justification for limiting the rule to E15, by providing EPA with the necessary data to conclude that E20 and I16 were also "substantially similar" to the E10 test fuel. Comments of Urban Air Initiative et al. 13–31, JA____; Comments of Gevo, JA____. The comments were thus relevant to the rule.

Second, the comments, if adopted, would have required EPA to change the E15 Rule. Adopting the comments would have required EPA to raise the sub-sim rule's ethanol ceiling to 20%, and to recognize that I16 blends are also

"substantially similar" to the E10 test fuel. It would have also required EPA to change the proposed RVP regulations to make E20 blends eligible for the 1-psi RVP waiver, because the 1-psi RVP waiver's E15 ceiling is premised on EPA's "substantially similar" definition. Response to Comments 6 & n.1 (concluding that "the 1-psi waiver is . . . applicable to gasoline-ethanol blends the agency finds are sub sim," and noting "that gasoline-ethanol blends higher than E15" are not substantially similar and cannot "be introduced into commerce at 10.0 psi"), JA___.

Because the comments were significant, EPA had to consider them and provide substantive reasons why, based on the relevant factors, it decided to stick to the proposed 15% ethanol ceiling and to exclude isobutanol in the final rule. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (rule requiring subscribers to pay "at least $75" for certain phones funded by the FCC was arbitrary and capricious because the agency failed to explain why it picked that amount). EPA provided no non-arbitrary reason for the ceiling in the final rule.

### B. The presidential directive does not excuse EPA's failure to respond to comments.

To be sure, EPA provided a reason *for ignoring* these comments, but this reason was arbitrary and capricious. In response to comments, EPA argued

that it was "acting in response to" a presidential directive instructing EPA to "consider" expanding the 1-psi RVP waiver to E15 blends, and thus that the comments it had expressly invited were "outside the scope of this action." Response to Comments 31, JA___. On the contrary, the comments were directly relevant to EPA's own statement about the lack of data regarding other fuel blends and its express request for comment on that issue, and they were relevant because they undermined EPA's sole justification to draw the line at E15. 84 Fed. Reg. at 10,601, JA___. Moreover, EPA failed to explain why it changed its understanding of the scope of the rulemaking and the directive between the proposal and the final rule. And the presidential directive did not prevent EPA from granting relief to fuel blends other than E15. *See* White House Fact Sheet (Oct. 11, 2018), JA___. Thus, this is not a case in which adopting the comments would have affirmatively frustrated "the President's policy directives." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). In any event, whatever the President's political goals are, an agency's action "must be tied" to the statute it implements, *Judulang*, 565 U.S. at 55, and it must be a "product of agency expertise," not an arbitrary backroom deal. *State Farm*, 463 U.S. at 43. Pointing to the President's directive to grant relief for E15 was thus no substitute for EPA's exercise of expert judgment and

consideration of the evidence when drawing an appropriate line between fuels that are substantially similar, and those that are not.

"[A] rulemaking [i]s arbitrary and capricious where the EPA has failed to respond to specific challenges that are sufficiently central to its decision." *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992). Because that is what happened here, the court should remand the E15 Rule so EPA can form a scientific judgment on whether E20 and I16 are "substantially similar" to the E10 emissions test fuel.

## IV.    THE COURT SHOULD REMAND THE RULE WITHOUT VACATUR.

Despite its defects, the E15 Rule represents a valuable improvement on EPA's former regulation of E15. Petitioners thus strongly oppose any equitable remedy that would vacate the E15 Rule and ask this Court only to remand the rule to the Agency.

This remedy is consistent with the Court's precedent. When a petitioner argues "only that [a rule] does not go far enough," raises "no objection to . . . leaving the current rule in place," and "request[s] only that [the Court] require the agency to engage in further rulemaking," this Court will not vacate the rule. *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151–52 (D.C. Cir. 2005). As this Court has recognized, under these circumstances, the equitable remedy of vacatur would unreasonably

"sacrifice such protection as [the rule] now provides, making the best an enemy of the good." *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 528 (D.C. Cir. 2009). Many cases hold that the Court "may remand without vacatur" under the Clean Air Act. *See United States Sugar Corp. v. EPA*, 830 F.3d 579, 630 (D.C. Cir. 2016); *see also* CAA § 307(d)(9) (the court "*may* reverse") (emphasis added).

Petitioners ask the Court to remand the E15 Rule because (1) its interpretation of § 211(f)(1) "does not go far enough" in allowing the sale of ethanol, *Advocates for Highway & Auto Safety*, 429 F.3d at 1151–52; (2) EPA failed to adequately explain its treatment of mid-level ethanol blends, *Am. Farm Bureau Fed'n*, 559 F.3d at 528; and (3) EPA failed to consider comments arguing that E20 and I16 are "substantially similar," *id.* Because vacating the E15 Rule would do more harm than good, would be disruptive, and would harm Petitioners, the Court should remand the E15 Rule without vacatur.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant their petition for review and remand the E15 Rule without vacatur.

Dated: May 12, 2020                    Respectfully submitted,


                                       /s/ Jonathan Berry
                                       C. BOYDEN GRAY
                                       JONATHAN BERRY
                                            *Counsel of Record*
                                       JAMES R. CONDE
                                       BOYDEN GRAY & ASSOCIATES
                                       801 17th St NW, #350
                                       Washington, DC 20006
                                       202-955-0620
                                       berry@boydengrayassociates.com

## CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(a)(7)(C) and Circuit Rule 32(a), this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) and the order of this court dated April 21, 2020, Dkt. #1839040, because the brief contains 12,410 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

/s/ Jonathan Berry

May 12, 2020                          Jonathan Berry

# ADDENDA

# ADDENDUM A
# STANDING DECLARATIONS

# ADDENDUM A
## STANDING DECLARATIONS
## TABLE OF CONTENTS

Page

Declaration of Jump Start Stores, Inc. ........................................................ A-1

Declaration of Little Sioux Corn Processors, LLC ...................................... A-2

**Declaration of Jump Start Stores Inc**

1. My name is Phillip L Near I am the President of Jump Start Stores, Inc., a fuel retailer and convenience store company with [13] stores located in Kansas.

2. Jump Start Store's customers demand mid-level premium blends like E20 (gasoline and 20% ethanol) and E30 (gasoline and 30% ethanol). To satisfy this demand, Jump Start Stores has invested thousands of dollars in blender pumps and other equipment certified to dispense any fuel blend consisting of gasoline and ethanol.

3. To the extent allowed by law, Jump Start Stores would like to use blender pumps in the future to sell E20 and E30 to all willing customers. Based on knowledge of the local market, Jump Start Stores believes that the sale of mid-level blends would expand store sales and increase profits.

4. I understand that the E15 Rule would purport to make it illegal or impractical for Jump Start Stores to sell mid-level blends. For example, EPA's rule limiting the one pound per square inch waiver to fuel blends containing no more than 15% ethanol would also make it impractical to sell mid-level blends during the summer, as in many instances it would be difficult or impossible to obtain low-volatility gasoline to make compliant mid-level blends.

5. The E15 Rule's restrictions on mid-level blends would injure Jump Start Stores and significantly reduce the value of Jump Start Store's investment in blender pumps.

6. I state under penalty of perjury that the foregoing is true and correct.


Executed on ___April 17___, 2020.

_Phillip L Near_

Phillip L Near

**Declaration of Little Sioux Corn Processors, LLC**

1. I am the CEO at Little Sioux Corn Processors LLC. I have been the CEO of LSCP since May 2002. I have served on the Renewable Fuels Association Board of Directors working toward the establishment of higher blends into the marketplace. I understand and support the benefits of higher blends in reducing carbon emissions and particulates released into the atmosphere by petroleum Octane products.

2. LSCP, LLC currently produces approximately 165 million gallons of ethanol per year. Most of this ethanol is sold as a motor vehicle fuel additive for use in the United States.

3. LSCP, LLC has spare capacity and would increase ethanol production to respond to increased demand for ethanol additive in gasoline.

4. LSCP, LLC would like to sell ethanol for use in mid-level blends containing more than 15% but less than 51% ethanol. Such blends would significantly expand commercial opportunities and revenue for our ethanol plant.

5. I understand that the E15 Rule would purport to make it illegal or impractical for LSCP, LLC to sell ethanol additive for use in mid-level blends. For example, EPA's rule limiting the one pound per square inch waiver to fuel blends containing no more than 15% ethanol would make it impractical to sell mid-level blends during the summer, as in many instances it would be difficult or impossible to obtain low-volatility gasoline to make compliant mid-level blends. The E15 Rule's restrictions on mid-level blends injure LSCP, LLC.

6. LSCP, LLC would also consider manufacturing isobutanol for use in gasoline if market conditions warrant and if regulatory constraints are not an impediment.

7. I state under penalty of perjury that the foregoing is true and correct.

Executed on _April 24_, 2020.

Stephen G Roe
CEO
LSCP, LLC

**ADDENDUM B**

**STATUTES AND REGULATIONS**

# ADDENDUM B

# STATUTES AND REGULATIONS

# TABLE OF CONTENTS

Page

## STATUTES

CAA § 203(a)(3)(A), 42 U.S.C. § 7522(a)(3)(A) ........................................... B-1

CAA § 206(a)(4)(A), 42 U.S.C. § 7525(a) ................................................... B-1

CAA § 211(a), 42 U.S.C. § 7545(a) ........................................................... B-2

CAA § 211(b), 42 U.S.C. § 7545(b) ........................................................... B-2

CAA § 211(c)(1), 42 U.S.C. § 7545(c)(1) .................................................... B-3

CAA § 211(d)(1), 42 U.S.C. § 7545(d)(1) ................................................... B-4

CAA § 211(e), 42 U.S.C. § 7545(e) ........................................................... B-4

CAA § 211(f), 42 U.S.C. § 7545(f) ............................................................ B-5

CAA § 211(h), 42 U.S.C. § 7545(h) ........................................................... B-6

CAA § 307(b), 42 U.S.C. § 7607(b) ........................................................... B-8

CAA § 307(d), 42 U.S.C. § 7607(d) ........................................................... B-8

# REGULATIONS

40 C.F.R. § 19.4, Table 2 ........................................................................... B-11

40 C.F.R. § 79.2 ......................................................................................... B-12

40 C.F.R. § 79.11 ....................................................................................... B-13

40 C.F.R. § 79.21 ....................................................................................... B-13

40 C.F.R. § 79.31(a) ................................................................................... B-14

40 C.F.R. § 79.32(a)(1) .............................................................................. B-14

40 C.F.R. § 79.51(c)(3) .............................................................................. B-14

40 C.F.R. § 79.56(e) ................................................................................... B-15

40 C.F.R. § 80.27(d) ................................................................................... B-18

40 C.F.R. § 80.1504 ................................................................................... B-18

40 C.F.R. § 80.1610 ................................................................................... B-19

40 C.F.R. § 86.113-04(a)(3)(i) ................................................................... B-20

40 C.F.R. § 86.1803-01 .............................................................................. B-20

40 C.F.R. § 86.1824-08(f)(1) ..................................................................... B-20

40 C.F.R. § 1065.710(b)(2) ........................................................................ B-21

40 C.F.R. § 1065.725 ................................................................................. B-22

# STATUTES

## CAA § 203(a)(3)(A), 42 U.S.C. § 7525(a)(3)(A), Anti-Tampering

(a)  ENUMERATED PROHIBITIONS.—The following acts and the causing thereof are prohibited—

  (3)(A) For any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this title prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser;

## CAA § 206(a)(4)(A), 42 U.S.C. § 7525(a)(4)(A), Test Fuels

(a)  TESTING AND ISSUANCE OF CERTIFICATE OF CONFORMITY.—

  (4)
  (A) Not later than 12 months after November 15, 1990, the Administrator shall revise the regulations promulgated under this subsection to add test procedures capable of determining whether model year 1994 and later model year light-duty vehicles and light-duty trucks, when properly maintained and used, will pass the inspection methods and procedures established under section 207(b) [42 U.S.C. § 7541(b)] for that model year, under conditions reasonably likely to be encountered in the conduct of inspection and maintenance programs, but which those programs cannot reasonably influence or control. The conditions shall include fuel characteristics, ambient temperature, and short (30 minutes or less) waiting periods before tests are conducted. The Administrator shall not grant a certificate of conformity under this subsection for any 1994 or later model year vehicle or engine that the Administrator concludes cannot pass the test procedures established under this paragraph.

## CAA § 211, 42 U.S.C. § 7545, Fuel Regulation

(a)     The Administrator may by regulation designate any fuel or fuel additive (including any fuel or fuel additive used exclusively in nonroad engines or nonroad vehicles) and, after such date or dates as may be prescribed by him, no manufacturer or processor of any such fuel or additive may sell, offer for sale, or introduce into commerce such fuel or additive unless the Administrator has registered such fuel or additive in accordance with subsection (b) of this section.

(b)     (1) For the purpose of registration of fuels and fuel additives, the Administrator shall require—

(A) the manufacturer of any fuel to notify him as to the commercial identifying name and manufacturer of any additive contained in such fuel; the range of concentration of any additive in the fuel; and the purpose-in-use of any such additive; and

(B) the manufacturer of any additive to notify him as to the chemical composition of such additive.

(2) For the purpose of registration of fuels and fuel additives, the Administrator shall, on a regular basis, require the manufacturer of any fuel or fuel additive—

(A) to conduct tests to determine potential public health and environmental effects of the fuel or additive (including carcinogenic, teratogenic, or mutagenic effects); and

(B) to furnish the description of any analytical technique that can be used to detect and measure any additive in such fuel, the recommended range of concentration of such additive, and the recommended purpose-in-use of such additive, and such other information as is reasonable and necessary to determine the emissions resulting from the use of the fuel or additive contained in such fuel, the effect of such fuel or additive on the emission control performance of any

vehicle, vehicle engine, nonroad engine or nonroad vehicle, or the extent to which such emissions affect the public health or welfare

Tests under subparagraph (A) shall be conducted in conformity with test procedures and protocols established by the Administrator. The results of such tests shall not be considered confidential

(3) Upon compliance with the provisions of this subsection, including assurances that the Administrator will receive changes in the information required, the Administrator shall register such fuel or fuel additive.

(4) STUDY ON CERTAIN FUEL ADDITIVES AND BLENDSTOCKS.—

(A) IN GENERAL.—Not later than 2 years after the date of enactment of this paragraph, the Administrator shall—

(i) conduct a study on the effects on public health (including the effects on children, pregnant women, minority or low-income communities, and other sensitive populations), air quality, and water resources of increased use of, and the feasibility of using as substitutes for methyl tertiary butyl ether in gasoline—

(I) ethyl tertiary butyl ether;
(II) tertiary amyl methyl ether;
(III) di-isopropyl ether;
(IV) tertiary butyl alcohol;
(V) other ethers and heavy alcohols, as determined by then Administrator;
(VI) ethanol;
(VII) iso-octane; and
(VIII) alkylates;

\*\*\*\*\*

(c) (1) The Administrator may, from time to time on the basis of information obtained under subsection (b) of this section or other

information available to him, by regulation, control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle, motor vehicle engine, or nonroad engine or nonroad vehicle if, in the judgment of the Administrator, any fuel or fuel additive or any emission product of such fuel or fuel additive causes, or contributes, to air pollution or water pollution (including any degradation in the quality of groundwater) that may reasonably be anticipated to endanger the public health or welfare, or (B)[1] if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.

*****

(d)     PENALTIES AND INJUNCTIONS.

(1) CIVIL PENALTIES.— Any person who violates subsection (a), (f), (g), (k), (l), (m), (n), or (o) of this section or the regulations prescribed under subsection (c), (h), (i), (k), (l), (m), (n), or (o) of this section or who fails to furnish any information or conduct any tests required by the Administrator under subsection (b) of this section shall be liable to the United States for a civil penalty of not more than the sum of $25,000 for every day of such violation and the amount of economic benefit or savings resulting from the violation. Any violation with respect to a regulation prescribed under subsection (c), (k), (l), (m), or (o) of this section which establishes a regulatory standard based upon a multiday averaging period shall constitute a separate day of violation for each and every day in the averaging period.

*****

(e)     (1) Not later than one year after the date of enactment of this subsection and after notice and opportunity for a public hearing, the Administrator

---

[1] There is no subparagraph (A) in subsection (c)(1).

shall promulgate regulations which implement the authority under subsection (b)(2) (A) and (B) with respect to each fuel or fuel additive which is registered on the date of promulgation of such regulations and with respect to each fuel or fuel additive for which an application for registration is filed thereafter.

(2) Regulations under subsection (b) to carry out this subsection shall require that the requisite information be provided to the Administrator by each such manufacturer—

(A) prior to registration, in the case of any fuel or fuel additive which is not registered on the date of promulgation of such regulations; or

(B) not later than three years after the date of promulgation of such regulations, in the case of any fuel or fuel additive which is registered on such date.

*****

(f)     (1)

(A) Effective upon March 31, 1977, it shall be unlawful for any manufacturer of any fuel or fuel additive to first introduce into commerce, or to increase the concentration in use of, any fuel or fuel additive for general use in light duty motor vehicles manufactured after model year 1974 which is not substantially similar to any fuel or fuel additive utilized in the certification of any model year 1975, or subsequent model year, vehicle or engine under section 206 [42 U.S.C. § 7525].

(B) Effective upon the date of the enactment of the Clean Air Act Amendments of 1990, it shall be unlawful for any manufacturer of any fuel or fuel additive to first introduce into commerce, or to increase the concentration in use of, any fuel or fuel additive for use by any person in motor vehicles manufactured after model year 1974 which is not substantially similar to any fuel or fuel additive utilized in the

certification of any model year 1975, or subsequent model year, vehicle or engine under section 206 [42 U.S.C. § 7525].

\*\*\*\*\*

(4) The Administrator, upon application of any manufacturer of any fuel or fuel additive, may waive the prohibitions established under paragraph (1) or (3) of this subsection or the limitation specified in paragraph (2) of this subsection, if he determines that the applicant has established that such fuel or fuel additive or a specified concentration thereof, and the emission products of such fuel or fuel additive or specified concentration thereof, will not cause or contribute to a failure of any emission control device or system (over the useful life of the motor vehicle, motor vehicle engine, nonroad engine or nonroad vehicle in which such device or system is used) to achieve compliance by the vehicle or engine with the emission standards with respect to which it has been certified pursuant to sections 206 and 213(a) [42 U.S.C. §§ 7525, 7547(a)]. The Administrator shall take final action to grant or deny an application submitted under this paragraph, after public notice and comment, within 270 days of the receipt of such an application.

(h)    REID VAPOR PRESSURE REQUIREMENTS.—

(1) PROHIBITION.— Not later than 6 months after the date of the enactment of the Clean Air Act Amendments of 1990, the Administrator shall promulgate regulations making it unlawful for any person during the high ozone season (as defined by the Administrator) to sell, offer for sale, dispense, supply, offer for supply, transport, or introduce into commerce gasoline with a Reid Vapor Pressure in excess of 9.0 pounds per square inch (psi). Such regulations shall also establish more stringent Reid Vapor Pressure standards in a nonattainment area as the Administrator finds necessary to generally achieve comparable evaporative emissions (on a per-vehicle basis) in nonattainment areas, taking into consideration the enforceability of such standards, the need of an area for emission control, and economic factors.

(2) ATTAINMENT AREAS.— The regulations under this subsection shall not make it unlawful for any person to sell, offer for supply, transport, or introduce into commerce gasoline with a Reid Vapor Pressure of 9.0 pounds per square inch (psi) or lower in any area designated under section 107 as an attainment area. Notwithstanding the preceding sentence, the Administrator may impose a Reid vapor pressure requirement lower than 9.0 pounds per square inch (psi) in any area, formerly an ozone nonattainment area, which has been redesignated as an attainment area.

(3) EFFECTIVE DATE; ENFORCEMENT.—The regulations under this subsection shall not make it unlawful for any person to sell, offer for supply, transport, or introduce into commerce gasoline with a Reid Vapor Pressure of 9.0 pounds per square inch (psi) or lower in any area designated under section 107 as an attainment area. Notwithstanding the preceding sentence, the Administrator may impose a Reid vapor pressure requirement lower than 9.0 pounds per square inch (psi) in any area, formerly an ozone nonattainment area, which has been redesignated as an attainment area.

(4) ETHANOL WAIVER.—For fuel blends containing gasoline and 10 percent denatured anhydrous ethanol, the Reid vapor pressure limitation under this subsection shall be one pound per square inch (psi) greater than the applicable Reid vapor pressure limitations established under paragraph (1); *Provided*, however, That a distributor, blender, marketer, reseller, carrier, retailer, or wholesale purchaser-consumer shall be deemed to be in full compliance with the provisions of this subsection and the regulations promulgated thereunder if it can demonstrate (by showing receipt of a certification or other evidence acceptable to the Administrator) that—

(A) the gasoline portion of the blend complies with the Reid vapor pressure limitations promulgated pursuant to this subsection;

(B) the ethanol portion of the blend does not exceed its waiver condition under subsection (f)(4); and

(C) no additional alcohol or other additive has been added to increase the Reid Vapor Pressure of the ethanol portion of the blend.

## CAA § 307, 42 U.S.C. § 7607, Judicial Review

(b)

     (1) A petition for review of action of the Administrator in promulgating . . . any control or prohibition under section 211 [42 U.S.C. § 7545] . . ., or final action taken, by the Administrator under this Act may be filed only in the United States Court of Appeals for the District of Columbia. . . . Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

     (2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

*****

(d)

     (6)           *****

     (B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

     (7)           *****

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) . . . . In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the

requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

*****

# REGULATIONS

## 40 C.F.R. § 19.4, Table 2, Civil Penalty Inflation Adjustments

Table 2 to § 19.4 sets out the statutory civil penalty provisions of statutes administered by EPA, with the third column displaying the original statutory civil penalty levels, as enacted. The fourth column of Table 2 displays the operative statutory civil penalty levels where penalties were assessed on or after August 1, 2016 but before January 15, 2017, for violations that occurred after November 2, 2015. The fifth column displays the operative statutory civil penalty levels where penalties were assessed on or after January 15, 2017 but before January 15, 2018, for violations that occurred after November 2, 2015. The sixth column displays the operative statutory civil penalty levels where penalties were assessed on or after January 15, 2018 but before February 6, 2019, for violations that occurred after November 2, 2015. The seventh and last column displays the operative statutory civil penalty levels where penalties are assessed on or after February 6, 2019, for violations that occur or occurred after November 2, 2015.

*****

| 42 U.S.C. 7545(d)(1) [CAA 211(d)(1)] | $25,000 | $44,539 | $45,268 | $46,192 | $47,357 |
|---|---|---|---|---|---|

*****

**40 C.F.R. § 79.2, Registration Definitions**

As used in this part, all terms not defined herein shall have the meaning given them in the Act:

*****

(c) Fuel means any material which is capable of releasing energy or power by combustion or other chemical or physical reaction.

(d) Fuel manufacturer means any person who, for sale or introduction into commerce, produces, manufactures, or imports a fuel or causes or directs the alteration of the chemical composition of a bulk fuel, or the mixture of chemical compounds in a bulk fuel, by adding to it an additive, except:

>(1) A party (other than a fuel refiner or importer) who adds a quantity of additive(s) amounting to less than 1.0 percent by volume of the resultant additive(s)/fuel mixture is not thereby considered a fuel manufacturer.

>(2) A party (other than a fuel refiner or importer) who adds an oxygenate compound to fuel in any otherwise allowable amount is not thereby considered a fuel manufacturer.

(e) Additive means any substance, other than one composed solely of carbon and/or hydrogen, that is intentionally added to a fuel named in the designation (including any added to a motor vehicle's fuel system) and that is not intentionally removed prior to sale or use.

(f) Additive manufacturer means any person who produces, manufactures, or imports an additive for use as an additive and/or sells or imports for sale such additive under the person's own name.

(g) Range of concentration means the highest concentration, the lowest concentration, and the average concentration of an additive in a fuel.

(h) Chemical composition means the name and percentage by weight of each compound in an additive and the name and percentage by weight of each element in an additive.

(i) Chemical structure means the molecular structure of a compound in an additive.

(j) Impurity means any chemical element present in an additive that is not included in the chemical formula or identified in the breakdown by element in the chemical composition of such additive.

(k) Oxygenate compound means an oxygen-containing, ashless organic compound, such as an alcohol or ether, which may be used as a fuel or fuel additive.

**40 C.F.R. § 79.11, Assurances of Fuel Manufacturers**

Each application for registration submitted by the manufacturer of a designated fuel shall include the following:

*****

(i) The manufacturer of any fuel which will be sold, offered for sale, or introduced into commerce for use in motor vehicles manufactured after model year 1974 shall demonstrate that the fuel is substantially similar to any fuel utilized in the certification of any 1975 or subsequent model year vehicle or engine, or that the manufacturer has obtained a waiver under 42 U.S.C. 7545(f)(4); and

(j) The manufacturer shall submit, or shall reference prior submissions, including all of the test data and other information required prior to registration of the fuel by the provisions of subpart F of this part.

**40 C.F.R. § 79.21, Assurances of Additive Manufacturers**

Each application for registration submitted by the manufacturer of a designated fuel additive shall include the following:

*****

(h) The manufacturer of any fuel additive which will be sold, offered for sale, or introduced into commerce for use in any type of fuel intended for use in

motor vehicles manufactured after model year 1974 shall demonstrate that the fuel additive, when used at the recommended range of concentration, is substantially similar to any fuel additive included in a fuel utilized in the certification of any 1975 or subsequent model year vehicle or engine, or that the manufacturer has obtained a waiver under 42 U.S.C. 7545(f)(4).

(i) The manufacturer shall submit, or shall reference prior submissions, including all of the test data and other information required prior to registration of the fuel additive by the provisions of subpart F of this part. C.F.R. § 79.21(h), Assurances for of Fuel Additive Manufacturers

## 40 C.F.R. § 79.31(a), Additive Registration

(a) All additives produced or sold for use in motor vehicle gasoline and/or motor vehicle diesel fuel are hereby designated. The Act defines the term "motor vehicle" to mean any self-propelled vehicle designed for transporting persons or property on a street or highway. For purposes of this registration, however, additives specifically manufactured and marketed for use in motorcycle fuels are excluded.

## 40 C.F.R. § 79.32(a)(1), Motor Vehicle Gasoline Designation

(a) The following fuels commonly or commercially known or sold as motor vehicle gasoline are hereby individually designated:

> (1) Motor vehicle gasoline, unleaded—motor vehicle gasoline that contains no more than 0.05 gram of lead per gallon;

## 40 C.F.R. § 79.51(c)(3), New Fuel and Fuel Additive Testing

*****

(c)

*****

> (3) New fuels and fuel additives. A fuel product shall be considered new if it is not registered pursuant to subpart B of this part as of May 27, 1994

and if, under the criteria established by § 79.56, it cannot be enrolled in the same fuel/additive group with one or more currently registered fuels. A fuel additive product shall be considered new with respect to a specific type of fuel if it is not expressly registered for that type of fuel pursuant to subpart C of this part as of May 27, 1994 and if, under the criteria established by § 79.56, the fuel/additive mixture resulting from use of the additive product in the specific type of fuel cannot be enrolled in the same fuel/additive group with one or more currently registered fuels or bulk fuel additives. For the purpose of this determination, currently registered fuels and bulk additives are those with existing registrations as of the date on which EPA receives the basic registration data (pursuant to § 79.59(b)) for the product in question. For such new product, the manufacturer must satisfactorily complete all applicable Tier 1 and Tier 2 requirements, followed by any Tier 3 testing which the Administrator may require, before registration will be granted.

*****

**40 C.F.R. § 79.56(e), Registration Testing Grouping Criteria**

(e) Grouping criteria. The grouping system is represented by a matrix of three fuel/additive categories within six specified fuel families (see table F94-7, Grouping System for Fuels and Fuel Additives). Each category may include one or more groups. Within each group, a representative may be designated based on the criteria in this section and joint registration information may be developed and submitted for member fuels and fuel additives.

(1) Fuel families. Each of the following six fuel families (Table F94-7, columns A-F) includes fuels of the type referenced in the name of the family as well as bulk and aftermarket additives which are intended for use in those fuels. When applied to fuel additives, the criteria in these descriptions refer to the associated additive/base fuel mixture, pursuant to § 79.51(h)(1). One or more base fuel formulations are specified for each fuel family pursuant to § 79.55.

(i) The Gasoline Family includes fuels composed of more than 50 percent gasoline by volume and their associated fuel additives. The base fuel for this family is specified in § 79.55(b).

*****

(3) This section defines the specific categories applicable to each fuel family. When applied to fuel additives, the criteria in these descriptions refer to the associated additive/base fuel mixture, pursuant to § 79.51(h)(1).

(i) Gasoline Categories.

(A) The Baseline Gasoline category contains gasoline fuels and associated additives which satisfy all of the following criteria:

(1) Contain no elements other than carbon, hydrogen, oxygen, nitrogen, and/or sulfur.

(2) Contain less than 1.5 percent oxygen by weight.

(3) Sulfur concentration is limited to 1000 ppm per the specifications cited in the following paragraph.

(4) Possess the physical and chemical characteristics of unleaded gasoline as specified by ASTM standard D 4814-93a (incorporated by reference, pursuant to paragraph (d)(5) of this section), in at least one Seasonal and Geographical Volatility Class.

(5) Derived only from conventional petroleum, heavy oil deposits, coal, tar sands, and/or oil sands.

(B) The Non-Baseline Gasoline category is comprised of gasoline fuels and associated additives which conform to the specifications in paragraph (e)(3)(i)(A) of this section for the Baseline Gasoline category except that they contain 1.5 percent or more oxygen by weight and/or may be derived from sources other than those listed in paragraph (e)(3)(i)(A)(5) of this section.

*****

(4) Fuel/additive groups. Fuel/additive groups are subdivisions of the fuel/additive categories. One or more group(s) are defined within each category in each fuel family according to the presence of differing characteristics in the fuel or additive/base fuel mixture. For each group, one formulation (either a base fuel or a member fuel or additive product) is chosen to represent all the member products in the group in any tests required under this subpart. The section which follows describes the fuel/additive groups.

*****

(ii) Non-baseline groups—

(A) Non-Baseline Gasoline. The Non-Baseline gasoline fuels and associated additives shall sort into groups according to the following criteria:

(1) For gasoline fuel and additive products which contain 1.5 percent oxygen by weight or more, a separate non-baseline gasoline group shall be defined by each oxygenate compound or methanol/co-solvent blend listed as a component in the registration application or basic registration data of any such fuel or additive.

(i) Examples of oxygenates occurring in non-baseline gasoline formulations include ethanol, methyl tertiary butyl ether (MTBE), ethyl tertiary butyl ether (ETBE), tertiary amyl methyl ether (TAME), diisopropyl ether (DIPE), dimethyl ether (DME), tertiary amyl ethyl ether (TAEE), and any other compound(s) which increase the oxygen content of the gasoline formulation. A separate non-baseline gasoline group is defined for each such oxygenating compound.

*****

(iii) For each such group, the representative to be used in testing shall be a formulation consisting of the gasoline base fuel blended with the relevant oxygenate compound (or methanol/co-solvent combination) in an amount equivalent to the highest actual or recommended concentration-in-use of the oxygenate (or methanol/co-solvent combination) recorded in the basic registration data of any member fuel or additive product. In the event that two or more products in the same group contain the same and highest amount of the oxygenate or methanol/co-solvent blend, then the representative shall be chosen at random for such candidate products.

*****

## 40 C.F.R. § 80.27(d), One psi RVP Waiver for Ethanol Blends

(d) *Special provisions for alcohol blends.* (1) Any gasoline which meets the requirements of paragraph (d)(2) of this section shall not be in violation of this section if its Reid vapor pressure does not exceed the applicable standard in paragraph (a) of this section by more than one pound per square inch (1.0 psi).

(2) In order to qualify for the special regulatory treatment specified in paragraph (d)(1) of this section, gasoline must contain denatured, anhydrous ethanol. The concentration of the ethanol, excluding the required denaturing agent, must be at least 9% and no more than 15% (by volume) of the gasoline. The ethanol content of the gasoline shall be determined by the use of one of the testing methodologies specified in § 80.47. The maximum ethanol content shall not exceed any applicable waiver conditions under section 211(f) of the Clean Air Act.

*****

## 40 C.F.R. § 80.1504(a), Misfueling Prohibitions

No person shall—

(a)

(1) Sell, introduce, cause or permit the sale or introduction of gasoline containing greater than 10 volume percent ethanol (i.e., greater than E10) into any model year 2000 or older light-duty gasoline motor vehicle, any heavy-duty gasoline motor vehicle or engine, any highway or off-highway motorcycle, or any gasoline-powered nonroad engines, vehicles or equipment.

(2) Manufacture or introduce into commerce E15 in any calendar year for use in an area prior to commencement of a survey approved under 80.1502 for that area.

(3) Be prohibited from manufacturing, selling, introducing, or causing or allowing the sale or introduction of gasoline containing greater than 10 volume percent ethanol into any flex-fuel vehicle, notwithstanding paragraphs (a)(1) and (a)(2) of this section.

## 40 C.F.R. § 80.1610, Standards for Producers of Denatured Fuel Ethanol

Beginning January 1, 2017, producers and importers of denatured fuel ethanol (DFE) or other oxygenates designated for use in transportation fuel must comply with the following requirements:

(a) Standards.

(1) The sulfur content must not be greater than 10 ppm.

(2) The DFE or other oxygenate must be composed solely of carbon, hydrogen, nitrogen, oxygen and sulfur.

(3) In the case of DFE, only previously certified gasoline (including previously certified blendstocks for oxygenate blending), gasoline blendstocks, or natural gas liquids may be used as denaturants.

(4) The concentration of all denaturants used in DFE is limited to a maximum of 3.0 volume percent.

(b) Registration. Unless registered under § 80.1450, the producer or importer of DFE or other oxygenate must register with EPA pursuant to the requirements of § 80.1650.

*****

### 40 C.F.R. § 86.113-04(3)(i), Mileage-Accumulation Fuel

(3)(i) Unless otherwise approved by the Administrator, gasoline representative of commercial gasoline that will be generally available through retail outlets must be used in service accumulation. Unless otherwise approved by the Administrator, where the vehicle is to be used for evaporative emission durability demonstration, such fuel must contain ethanol as required by § 86.1824-08(f)(1).

### 40 C.F.R. § 86.1803-01, Flex-Fuel Vehicle Definition

Flexible fuel vehicle means any motor vehicle engineered and designed to be operated on a petroleum fuel and on a methanol or ethanol fuel, or any mixture of the petroleum fuel and methanol or ethanol. Methanol-fueled and ethanol-fueled vehicles that are only marginally functional when using gasoline (e.g., the engine has a drop in rated horsepower of more than 80 percent) are not flexible fuel vehicles.

### 40 C.F.R. § 86.1824-08(f)(1), Mileage-Accumulation Fuel Ethanol Content

This section describes durability demonstration procedures for evaporative emissions. Eligible small-volume manufacturers or small-volume test groups may optionally meet the requirements of §§ 86.1826 and 86.1838 instead of the requirements of paragraphs (a) through (j) of this section. A separate durability demonstration is required for each evaporative/refueling family.

*****

(f) Fuel requirements.

(1) For gasoline fueled vehicles certified to meet the evaporative emission standards set forth in this subpart, any mileage accumulation method for evaporative emissions must employ gasoline fuel for the entire mileage accumulation period which contains ethanol in, at least, the highest concentration permissible in gasoline under federal law and that is commercially available in any state in the United States. Unless otherwise approved by the Administrator, the manufacturer must determine the appropriate ethanol concentration by selecting the highest legal concentration commercially available during the calendar year before the one in which the manufacturer begins its mileage accumulation. The manufacturer must also provide information acceptable to the Administrator to indicate that the mileage accumulation method is of sufficient design, duration and severity to stabilize the permeability of all non-metallic fuel and evaporative system components to the mileage accumulation fuel constituents.

(2) For flexible-fueled, dual-fueled, multi-fueled, ethanol-fueled and methanol-fueled vehicles certified to meet the evaporative emission standards set forth in § 86.1811-04(e)(1), any mileage accumulation method must employ fuel for the entire mileage accumulation period which the vehicle is designed to use and which the Administrator determines will have the greatest impact upon the permeability of evaporative and fuel system components. The manufacturer must also provide information acceptable to the Administrator to indicate that the mileage accumulation method is of sufficient design, duration and severity to stabilize the permeability of all non-metallic fuel and evaporative system components to mileage accumulation fuel constituents.

*****

## 40 C.F.R. § 1065.710(b), Gasoline Test Fuel

(a) This section specifies test fuel properties for gasoline with ethanol (low-level blend only) and for gasoline without ethanol. Note that the "fuel type" for the fuels specified in paragraphs (b) and (c) of this section is considered to be gasoline. In contrast, fuels with higher ethanol concentrations, such as fuel containing 82 percent ethanol, are considered to be ethanol fuels rather than

gasoline. . . . Unless the standard-setting part specifies otherwise, use the fuel specified in paragraph (c) of this section for general testing.

(b) The following specifications apply for a blended gasoline test fuel that has nominally 10% ethanol (commonly called E10 test fuel):

(1) Prepare the blended test fuel from typical refinery gasoline blending components. You may not use pure compounds, except as follows:

(i) You may use neat ethanol as a blendstock.

\*\*\*\*\*

## 40 C.F.R. § 1065.725, High-Level Ethanol-Gasoline Blends

For testing vehicles capable of operating on a high-level ethanol-gasoline blend, create a test fuel as follows:

(a) Add ethanol to an E10 fuel meeting the specifications described in § 1065.710 until the ethanol content of the blended fuel is between 80 and 83 volume %.

(b) You may alternatively add ethanol to a gasoline base fuel with no ethanol if you can demonstrate that such a base fuel blended with the proper amount of ethanol would meet all the specifications for E10 test fuel described in § 1065.710, other than the ethanol content.

(c) The ethanol used for blending must be either denatured ethanol meeting the specifications in 40 CFR 80.1610, or fuel-grade ethanol with no denaturant. Account for the volume of any denaturant when calculating volumetric percentages.

(d) The blended test fuel must have a dry vapor pressure equivalent between 41.5 and 45.1 kPa (6.0 and 6.5 psi) when measured using the procedure specified in § 1065.710. You may add commercial grade butane as needed to meet this specification.

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to

electronic service are being served today with a copy of this document via the

Court's CM/ECF. All parties in this case are represented by counsel

consenting to electronic service.

/s/ Jonathan Berry

May 12, 2020                                    Jonathan Berry